650 So.2d 969 (1994)
Rodney Tyrone LOWE, Appellant,
v.
STATE of Florida, Appellee.
No. 77972.
Supreme Court of Florida.
November 23, 1994.
Rehearing Denied March 9, 1995.
*971 Richard L. Jorandby, Public Defender, and Margaret Good-Earnest, Asst. Public Defender, Fifteenth Judicial Circuit, West Palm Beach, for appellant.
Robert A. Butterworth, Atty. Gen., and Sara D. Baggett, Asst. Atty. Gen., West Palm Beach, for appellee.
PER CURIAM.
Rodney Tyrone Lowe appeals his conviction of first-degree murder and sentence of death. We have jurisdiction, article V, section 3(b)(1), Florida Constitution, and affirm Lowe's conviction and death sentence.
The record reveals the following facts. On the morning of July 3, 1990, Donna Burnell was working as a clerk at the Nu-Pack convenience store in Indian River County when a would-be robber shot her three times with a .32 caliber handgun. Ms. Burnell suffered gunshot wounds to the face, head, and chest and died on the way to the hospital. The killer fled the scene without taking any money from the cash drawer.
During the week following the shooting, investigators received information linking the defendant, Rodney Lowe, to the crime. Lowe was questioned by investigators at the police station and, after speaking to his girlfriend, gave a statement that implicated him in the murder. Following this statement, Lowe was arrested and indicted for first-degree murder and attempted robbery.
At trial, the State presented witnesses who testified that, among other things, Lowe's fingerprint had been found at the scene of the crime, his car was seen leaving the parking lot of the Nu-Pack immediately after the shooting, his gun had been used in the shooting, his time card showed that he was clocked-out from his place of employment at the time of the murder, and Lowe had confessed to a close friend on the day of the shooting. The State also presented, over defense objection, the statement Lowe gave to the police on the day of his arrest. Lowe advanced no witnesses or other evidence in his defense. After closing arguments, the jury returned a verdict finding Lowe guilty of first-degree murder and attempted armed robbery with a firearm as charged.
In the penalty phase, the State introduced a certified copy of Lowe's previous conviction for robbery. Lowe presented testimony in mitigation from a principal at the correctional institution school who testified that Lowe earned his GED and did a good job working as a teacher's aide in her class; that Lowe helped other inmates with their education; that he adapted well to the structured environment of the prison; and that Lowe had not been in any serious trouble during his incarceration pending trial. A pastor of Bible studies at the correctional institution testified that he met Lowe in prison during his previous incarceration and had recommended him to stay at a halfway house, where he stayed for five months after he was released from prison; that Lowe handled responsibility well, was friendly, tried to do his best, and got a job with a lumber company; he concluded that Lowe seemed to have fallen in with a bad crowd after he left the halfway house. Lowe's employer at the lumber company testified that Lowe was an excellent employee, hard-working and reliable, and was liked by the other employees; further, that Lowe gained more responsibility over time and eventually was in charge of the yard when the foreman was not there. Other employees testified that Lowe was a good worker, reliable, and friendly. Lowe's aunt testified concerning his childhood and the fact that his father converted to the Jehovah's Witness faith when Lowe was a teenager. This, in her opinion, caused problems because the children rebelled. She explained that because of this Lowe was unhappy as a teenager and got into trouble as a teenager more serious than normal. Lowe's father was called by the State in rebuttal and explained that the aunt visited only twice a *972 year; he agreed that he was a strict disciplinarian, but that he did not believe his religion caused his son to commit these acts. He stated that he would never speak to his son again. At the conclusion of the penalty phase, the jury, by a nine-to-three vote, recommended the imposition of the death penalty.
The judge followed the jury's recommendation and imposed the death penalty, finding two aggravating circumstances, specifically: (1) the defendant was previously convicted of a felony involving the use or threat of violence to the person; and (2) the capital felony was committed while the defendant was engaged in or was an accomplice in the attempt to commit any robbery. In imposing the death penalty, the trial judge expressly found the mitigating circumstances did not outweigh the aggravating factors. The trial judge also sentenced Lowe to fifteen years' imprisonment for the attempted robbery conviction. In this appeal, Lowe raises ten issues concerning the guilt phase of his trial and seven issues regarding the penalty phase.

Guilt Phase
We find that seven of the guilt phase claims merit discussion.
In his first claim, Lowe asserts that the trial court erred in admitting his confession at trial primarily because the police used his girlfriend as an agent to coerce a confession from him after he had invoked his right to counsel.[1]
The following background facts are pertinent to this claim. One week after the murder, two investigators that had been working on the case, Investigator Kerby and Sergeant Green, learned that Lowe and his girlfriend had gone to the Vero Beach Sheriff's Office to discuss a matter unrelated to the instant case. Already suspecting Lowe's involvement in the murder, Kerby and Green went to the sheriff's office where they separated Lowe and his girlfriend and, after Lowe had waived his Miranda[2] rights, began to question him concerning the murder of Donna Burnell. Lowe denied any involvement in the murder and eventually invoked his right to counsel. The interrogation ceased and Lowe was left alone in the interrogation room. Neither Kerby nor Green bothered to put Lowe in contact with an attorney because, as they were to later testify, they did not expect to continue the questioning.
Throughout the interrogation, Lowe's girlfriend had been sitting in a nearby room and had overheard much of the conversation. She became emotional and was moved to another room. After Kerby and Green left Lowe, they went to the room where the girlfriend was waiting and, at her request, explained to her the extent of the evidence they had compiled against Lowe. The girlfriend stated to the investigators that she wanted to speak to Lowe to find out what happened. She also agreed to have her conversation with Lowe recorded. Kerby later testified that, although no one urged the girlfriend to speak to Lowe, he knew there was "a good possibility" that she was going to try to get Lowe to admit his involvement in the murder.
The girlfriend succeeded in convincing Lowe to speak to the police. When Kerby returned to the interrogation room to get the girlfriend, Lowe, without prompting, told Kerby that he wanted to speak with him again. Lowe then gave the investigators a statement in which he confessed that he was the driver of the getaway car involved in the crime but denied any complicity in the murder, which he blamed on one of two alleged accomplices. Lowe's confession to Kerby ended when Lowe once again asked for an attorney.
Based on these facts, Lowe argues that the police incited his girlfriend by telling her the *973 extent of the evidence they had compiled against him and then sent her in to the interrogation room with the hope that she would get Lowe to confess. Lowe relies on Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), in support of his argument that these actions amount to improper police custodial interrogation. We find that the facts in Innis are clearly distinguishable from the circumstances in the instant case. Lowe relies on the following language in that opinion:
A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect ... amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.
Innis, 446 U.S. at 302, 100 S.Ct. at 1690 (footnote omitted). According to Lowe, he was unconstitutionally interrogated by the police through the agency of his girlfriend because the police should have known that the girlfriend would elicit an incriminating response from him under the circumstances of this case.
We reject Lowe's argument because we find that a more recent case from the United States Supreme Court is directly on point with the instant case and it permits this confession to be admitted at trial. In Arizona v. Mauro, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987), the defendant was arrested for murder and taken to the police station for questioning, which ended after the defendant asked for an attorney. Throughout the interrogation of the defendant, the police were questioning the defendant's wife in a nearby room. The wife suspected her husband of the murder and persisted in speaking with him. After obtaining the approval of a supervisor, and with the expressed knowledge that the defendant would possibly incriminate himself, the police allowed the wife to speak with the defendant in the interrogation room.
The trial court in Mauro refused to suppress a recording made by the police of the defendant's incriminating conversation with his wife and he was subsequently convicted of the murder. On appeal, the Arizona Supreme Court reversed the conviction based on the above quote from Innis and because the police admitted that they knew that it was possible the defendant would incriminate himself because of this police action. The State of Arizona sought certiorari review in the United States Supreme Court. The issue before the Court was whether the police had interrogated the defendant in violation of the Fifth and Fourteenth Amendments when they allowed him to speak with his wife in the presence of a police officer. The Court held that the Arizona Supreme Court had misconstrued Innis and reversed. The Court explained that, "[i]n deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in Miranda and Edwards: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." 481 U.S. at 529-30, 107 S.Ct. at 1937. Furthermore, interrogation may be express or its functional equivalent, and in determining whether police are engaging in conduct that they "`should know [is] reasonably likely to elicit an incriminating response,'" the focus is "`primarily upon the perceptions of the suspect, rather than the intent of the police.'" Id. at 526-27, 107 S.Ct. at 1935 (quoting Innis, 446 U.S. at 301, 100 S.Ct. at 1690).
The United States Supreme Court in Mauro noted that there was no express interrogation by the police; there was no evidence of a psychological ploy; and the police did not put the wife in the room in order to seek incriminating responses but merely yielded to her persistent demands. The United States Supreme Court specifically recognized the police officers' admission that they expected that the defendant would incriminate himself. The Court looked at the situation from the defendant's perspective and found: "We doubt that a suspect, told by officers that his wife will be allowed to speak to him, would feel that he was being coerced to incriminate *974 himself in any way." 481 U.S. at 528, 107 S.Ct. at 1936.
In the instant case, the trial court found substantially the same facts as those in Mauro and refused to suppress the tape-recording of Lowe's conversation with his girlfriend. We find that Mauro allows the admission of Lowe's statements to his girlfriend. The girlfriend testified at trial that she already had suspicions that Lowe might have been involved in the crime before she spoke with the investigators and that her conversation with Lowe was not prompted by the police. The following exchange took place at trial between the prosecutor and the girlfriend concerning the relationship between the police and the girlfriend:
Q They didn't ask you that you should go in there, you should question Rodney and you should attempt to gain a confession and this is what you should say and this is what you should ask. You asked them to speak to Rodney.
A Yes.
Q That's correct, isn't it?
A Yes.
We find that, under these circumstances, the police did not employ the girlfriend as an agent to coerce a confession from Lowe and that the trial court did not err in admitting Lowe's incriminating statement.
In his second claim, Lowe asserts that the trial court erred in allowing the jury to hear portions of the taped interrogation of Lowe in which Investigator Kerby referred to Lowe's previous robbery conviction and the fact that he had been previously incarcerated and also stated his opinion that Lowe was guilty of the murder in the instant case and lacked remorse. Prior to trial, the State redacted the references to Lowe's criminal history from the tape at defense counsels's request. Defense counsel then approved the redactions in a hearing before the trial judge. Because no further objection to the tape was made, this claim is barred by our contemporaneous objection rule. See Castor v. State, 365 So.2d 701 (Fla. 1978). Contrary to Lowe's assertion, we find that any error in admitting the unredacted portions of the tape was not fundamental error so as to defeat our application of the contemporaneous objection rule.
In his third claim, Lowe argues that the trial court erred in allowing the State to introduce into evidence the entire contents of a box containing Lowe's personal items. One of the items in the box was a pair of sunglasses belonging to Lowe that were allegedly similar to the glasses worn by the person seen leaving the Nu-Pack immediately after the murder. The State moved to have all of the contents of the box admitted into evidence in order to prove that the glasses belonged to Lowe exclusively. Along with the sunglasses, there were other personal items in the box. Included were a presentence investigation report from Lowe's earlier conviction and letters from Lowe's mother detailing Lowe's prior exploits and sins. We find that this issue is also barred for lack of a contemporaneous objection. Defense counsel's objection to the introduction of this evidence was based on relevancy. We find that the box was relevant to prove that the items in the box belonged to Lowe personally and were his exclusively. The sunglasses in the box, being personal to Lowe, were relevant to the evidence in this case. The sunglasses were the evidence defense counsel was trying to keep out by his objection. The wording of the objection indicates that counsel was certainly aware of the nature of the remaining contents of the box at the time of the objection but no objection was made on the basis of prejudice from the PSI and the mother's letters. Further, we find that, even if counsel had preserved this issue for review, any error in admitting these items into evidence was harmless beyond a reasonable doubt given the record in this case.
Lowe's fourth claim concerns his contention that he was denied his constitutional rights to effective assistance of counsel and the equal protection of the law when the trial court refused to appoint two attorneys to assist in Lowe's defense. Lowe bases his equal protection argument on the assertion that the circuit in which Lowe was tried typically appoints two attorneys to represent indigent defendants in capital proceedings. We find that, despite the local practice of *975 appointing dual attorneys, the decision of whether to appoint co-counsel is not a right but is a privilege that is subject to the trial court's discretion. After having reviewed the entire record we find that the trial court did not abuse its discretion in refusing to appoint co-counsel.[3]
We find no merit to Lowe's fifth claim that the trial court erred in failing to conduct a Nelson[4] inquiry after Lowe expressed dissatisfaction with his appointed trial counsel. The record indicates that in a pretrial hearing Lowe told the trial court judge he felt that appointed counsel was not doing his best to represent him. Despite persistent questioning by the judge, Lowe could give no specific reason for his assertion. Lowe finally told the judge, "Never mind... . Just forget it, man." Later in the same hearing, the judge raised the issue again with Lowe and assured him that his attorney was filing motions and otherwise working on his case. No other inquiry was held at that time and Lowe proceeded to trial with the appointed counsel. After having reviewed the relevant portions of the record, we find that the trial judge conducted an adequate inquiry under the circumstances of this case. As a practical matter, a trial judge's inquiry into a defendant's complaints of incompetence of counsel can be only as specific and meaningful as the defendant's complaint. Cf. Wilder v. State, 587 So.2d 543, 544-45 (Fla. 1st DCA 1991) (finding a motion for substitution of counsel was properly denied where defendant stated only generalized allegations). In this case Lowe's complaints were merely generalized grievances and, despite the trial judge's questioning, Lowe could point to no specific acts of counsel's alleged incompetence.
Lowe's sixth claim asserts that the trial court erred in denying a motion for mistrial after the prosecutor misstated the law in closing arguments.[5] We find that the trial court did not err in refusing to grant a mistrial under these circumstances. We note that the misstatement involved a minor issue and that the jury instructions given almost immediately after the closing argument corrected the misstatement.
The seventh claim relates to an asserted trial court error in the exclusion of testimony from the victim's son, who was a witness to his mother's murder. The record reveals that at the time of the shooting the victim's three-year-old son was at the convenience store and witnessed his mother's murder. While paramedics were trying to save his mother's life, the child told a family friend who had arrived at the scene that "two peoples came in, argued with Mommy and bang, bang, bang." The State filed a motion in limine seeking to exclude the child's statement on the grounds that the child was incompetent at the time of the statement.[6] At a hearing on the motion the father of the child testified that the child had a learning disability and did not know his numbers. The father also explained that when the child used the word "peoples," "[i]t just meant everybody. I mean its  that was his word, peoples. I was a peoples, you know. Everybody was a peoples, even if there was just one person." This testimony was corroborated by a family friend. The trial judge reviewed this testimony and a videotape deposition *976 of the child and excluded the statement on the grounds of incompetency.
Lowe claims that the trial judge erred in excluding this evidence and that it is relevant because it tends to support Lowe's statement to the police that his two accomplices were responsible for the murder. We have reviewed the relevant portions of the record, including the motions and depositions involved in this issue, and find that the trial judge did not abuse his discretion in excluding the child's statement on the grounds of competency. Although in general, "every person is competent to be a witness," section 90.601, Florida Statutes (1989), a trial judge is permitted to exclude a witness when that witness is "[i]ncapable of expressing himself concerning the matter in such a manner as to be understood." § 90.603(1), Fla. Stat. (1989). In Clinton v. State, 53 Fla. 98, 105, 43 So. 312, 315 (1907), this Court stated, "Where it appears that ... [a witness] has sufficient intelligence to receive just impressions of the facts respecting which he is to testify, and sufficient capacity to relate them correctly ... he should be admitted to testify." (Emphasis added). We find that the trial judge did not abuse his discretion in finding that the child was incompetent to testify because he lacked the capacity to correctly relate the events surrounding his mother's murder.[7] The remaining guilt phase issues are without merit and warrant no discussion.[8]

Penalty Phase
The primary issue in the penalty phase concerns whether the trial judge failed to consider or weigh mitigating evidence before imposing the death penalty. Lowe asserts that the trial judge gave no weight to any of the mitigating evidence presented at the penalty phase of his trial. The State responds that it is obvious from the trial judge's sentencing order that the judge considered all of Lowe's mitigating evidence but concluded that the evidence was not of a truly mitigating nature, or that, even if it were of a mitigating nature, it would not outweigh the aggravating circumstances.
Our review of the sentencing order reveals that the trial judge considered seven allegedly mitigating factors. The judge found that two of the factors, "disproportionate punishment" and "minor participant in the crime of another," were not established by the evidence. The judge then found that the remaining factors, "defendant was 20-years-old at the time of the crime," "defendant functions well in a controlled environment," "defendant was a responsible employee," "defendant's family background," and "defendant participated in Bible studies," were not of a mitigating nature. While we might take issue with the trial judge's characterization of these factors as nonmitigating, we need not elaborate given that the trial judge also stated that, even if these factors were of a mitigating nature, they "would not outweigh the aggravating circumstances of committing a prior robbery and committing a murder during the commission of another attempted robbery." The trial judge then concluded: "Therefore, after weighing both of the proven aggravating circumstances against the evidence *977 and circumstances presented by the Defendant, I find there are sufficient aggravating circumstances to justify the sentence of death." We find that the trial judge properly considered the mitigating evidence presented by Lowe and affirm his decision that the death penalty is justified under the circumstances of this case.
We find that the remaining penalty phase issues presented by Lowe are without merit and warrant no discussion.[9] Accordingly, we affirm Lowe's conviction for the first-degree murder of Donna Burnell and his death sentence.
It is so ordered.
GRIMES, C.J., OVERTON, SHAW and HARDING, JJ., and McDONALD, Senior Justice, concur.
KOGAN, J., concurs in part and dissents in part with an opinion.
KOGAN, Justice, concurring in part, dissenting in part.
In State v. Dixon, 283 So.2d 1, 7 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974), this Court announced the principle that
[d]eath is a unique punishment in its finality and in its total rejection of the possibility of rehabilitation. It is proper, therefore, that the Legislature has chosen to reserve its application to only the most aggravated and unmitigated of most serious crimes.
To my mind, the present case falls within the category contemplated by Dixon. The case for aggravation here is a relatively weak one, consisting entirely of a prior felony conviction and the robbery associated with Lowe's crime. Meanwhile, the trial court obviously gave little if any weight to the evidence that Lowe has adapted well to life in the prison setting and is capable of rehabilitation there. Such evidence is clearly mitigating, Cooper v. Dugger, 526 So.2d 900 (Fla. 1988), in keeping with the general policy that death should not be imposed where the evidence supporting a potential for rehabilitation is strong. Added to the other mitigating evidence in the record, this factor strongly supports the conclusion that death is not a proportionate penalty in this case. I would so hold.
NOTES
[1] Lowe also asserts that the confession should have been suppressed because: (1) Investigator Kerby continued to question Lowe after he had asked for an attorney; (2) his statement was the product of duress after his girlfriend promised him both love and money if he would only confess; and (3) Kerby reinitiated the interrogation before Lowe made a knowing and intelligent waiver of his rights. After having carefully reviewed the record, we find these claims to be without merit.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] We note that a trial judge is authorized by law to appoint co-counsel in the situation presented by the facts in the instant case. See § 925.035, Fla. Stat. (1993) (as to a public defender with a conflict on a capital case, "it shall be his duty to move the court to appoint one or more members of The Florida Bar ... to represent th[e] accused."). Although we encourage trial judges to appoint dual counsel pursuant to this statute under the proper circumstances, we do not suggest that dual representation is mandated in every circumstance.
[4] Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973).
[5] Lowe also asserts that the prosecutor's closing argument was improper for other reasons. These issues are procedurally barred for lack of a contemporaneous objection.
[6] The State also argued that the child's statement, which was to be introduced into evidence through the testimony of the family friend, was inadmissible hearsay. Defense counsel countered that the statement came within the excited utterance exception to the hearsay rule. See § 90.803(2), Fla. Stat. (1989). Because the trial judge did not reach the merits of this argument we decline to address it.
[7] Incredible as it may seem, the record developed at the motion hearing indicates this child did not understand that he was referring to a number when he stated that "two" people shot his mother. The transcription of the videotaped deposition of the child reveals the following exchanges:

Q How many  how many people were there?
A One.
Q One? But you're holding up two fingers?
A Yea.
.....
Q ... how many feet do you have?
A One.
Q You have one feet?
A Yea.
.....
Q How many fingers am I holding up?
A One.
Q One?
A Yea.
Q How many am I holding up now?
A One.
Q One?
A Yea.
.....
Q Okay. What color is my tie?
A One.
[8] Those issues are whether the trial judge erred in denying a motion for disqualification and in giving a special jury instruction concerning inconsistent exculpatory statements.
[9] In addition to the issues discussed in this opinion, Lowe has also raised the following: (1) whether it was error to instruct the jury on the "heinous, atrocious or cruel" and "cold, calculated and premeditated" aggravating circumstances; (2) whether the State's penalty phase arguments were improper; (3) whether the court gave excessive weight to the prior violent felony aggravator; (4) whether the trial judge erred in allowing evidence of the circumstances surrounding Lowe's prior felony to be admitted in the penalty phase; (5) whether the trial judge erred in refusing a jury instruction concerning the child's presence at the murder; and (6) whether the trial judge erred in failing to inquire into the whereabouts of two defense witnesses who failed to show up during the penalty phase.