709 So.2d 87 (1997)
Johnnie Lewis NORTON, Appellant,
v.
STATE of Florida, Appellee.
No. 88803.
Supreme Court of Florida.
December 24, 1997.
Rehearing Denied April 30, 1998.
*88 James Marion Moorman, Public Defender, and Robert F. Moeller, Assistant Public Defender, Tenth Judicial Circuit, Bartow, for Appellant.
Robert A. Butterworth, Attorney General, and Carol M. Dittmar, Assistant Attorney General, Tampa, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Johnnie Norton. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. While we find that there is an absence of evidence in the record to support the finding of premeditation necessary to sustain Norton's conviction for first-degree murder, we find that the evidence in the record supports a conviction for manslaughter.

FACTS
The record in this case reflects the following facts. At approximately 7 a.m. on November 3, 1994, the body of Lillie Thornton was discovered in an open field among trash and debris near 30th Street and 38th Avenue in Tampa. The victim was found lying face down with a gunshot wound to the back of her head and an imprint from a tire track on the back of her right pant leg. The imprint on the victim's leg matched the tread characteristics on one of the tires on appellant's car. There were no signs of a struggle and no injuries indicating defensive wounds. The medical examiner estimated that the time of death occurred within the previous twenty-four hours between 7:30 p.m. on November 2 and 1:30 a.m. on November 3.
On the previous day, the victim had left her apartment with appellant sometime between 11:30 a.m. and noon. She had just received a monthly check and wanted to pay some bills. They were not seen again until that night around 10:30 or 11 p.m. by Kim McDonald, who did not know Thornton's actual name, but knew her only as "Slim." *89 McDonald testified that she saw Thornton get out of Norton's small grey Subaru in front of a store and walk around to the back while appellant waited in the car. McDonald had seen "Slim" in the area roughly six or seven times before and claimed to have known appellant for the previous five or six years, even though she did not know his last name. McDonald testified that, after observing what appeared to be a hand-to-hand drug transaction, she saw Thornton get back into the car with appellant, who was driving, and they drove away. No one else was in the car. When Thornton's body subsequently was found, two cubes of crack cocaine were discovered tucked inside her brassiere and her urine and blood tested positive for cocaine.
From McDonald's description and identification of Norton from a photopack line-up, the police were able to obtain his name and address and responded to his home on November 4. Appellant lived slightly over a mile from where the victim's body was found. When Detective Childers arrived at Norton's house, he noticed a car matching the description provided by McDonald and noted an apparent blood stain on the passenger side window of appellant's car. As Detective Childers left to prepare a request for a search warrant, two detectives were dispatched to appellant's home for surveillance. Around noon that same day, the detectives observed appellant's car begin to move. It became apparent to them that appellant was accelerating in an attempt to flee. After a brief chase, the police brought Norton's car to a stop at a drive-in theater and placed him in the back of one of the police cars while Detective Childers was notified.
When Detective Childers arrived at the drive-in theater, he told appellant that he was investigating the death of Lillie Thornton and asked him if he knew her or had seen her on November 2. Appellant explained that he had known the victim for two or three months, that he had picked her up on November 2 between 11:30 a.m. and noon so she could pay some bills, but his car broke down a few blocks away. According to appellant, Thornton got out of the car and walked toward some mailboxes. He did not see her again. Appellant tried to contact his brother, Trumell Norton, for help with the car by leaving messages with his mother. He claims he stayed with his car until 6 or 6:30 p.m. that evening at which time his brother finally arrived and managed to get the car started. Appellant, who was living with his mother, claims that he drove home and went to bed around 7 p.m. and did not go out again that evening.[1]
Childers then pointed to the apparent blood smear on the passenger side window. Appellant asked Childers to show him where the blood was on the seat, to which Childers responded that it was not on the seat but on the window. To that, appellant did not respond. However, Norton mentioned that he cut his hand three weeks before and indicated there was a t-shirt with his blood on it in the trunk of his car. Subsequent DNA tests revealed that the blood profile on the t-shirt matched that of appellant. The blood found on the passenger side window, as well as on the tubing around the window track, matched that of the victim.[2] Photographs were taken *90 of the car depicting the blood stain on the window and later admitted in evidence.
The carpeting inside appellant's car had been removed with only small amounts remaining in the crevices. Detective Childers also noted that the car smelled "freshly cleaned" and there were no scratches on the metal floor of the car normally caused by "people getting in and out." When asked about the missing carpet, appellant stated that the car did not have any carpeting when he purchased it several months earlier. However, Star Thornton, the victim's daughter, testified that the car had carpeting when she rode in it sometime after October 22, 1994. James Ferguson, who sold the car to appellant, also testified that the car contained carpeting when he sold it to appellant in August of 1994. One of appellant's sisters, on the other hand, testified that she remembers seeing the car without carpeting although she does not recall the specific date. The carpeting for appellant's car was never located.
The police read appellant his Miranda warnings and placed him under arrest for first-degree murder and robbery.[3] During a subsequent search of appellant's car, a .380 caliber shell casing was discovered on the back seat.[4] A comparison of the casing and the ammunition components removed from the victim's skull revealed that they were from the same caliber firearm and manufacturer. However, a subsequent test on the interior of Norton's car for the existence of vaporous lead (which indicates whether a gun has been discharged) failed to detect the presence of lead. Therefore, it could not conclusively be determined whether a gun was "fired or not fired" inside the car.
The only evidence as to possession of a firearm came from James Watson, who worked with appellant at Cast-Crete during the fall of 1994. He testified that appellant asked him if he was interested in purchasing a gun. Watson, however, did not purchase any gun from appellant as he did not have any money at the time. When asked why appellant was offering to sell him a gun, Watson stated that appellant had mentioned that he was short on cash and needed money to buy some cakes for a birthday party. The firearm used to kill Thornton, however, was never found.
After his arrest, appellant told the police that he had purchased new tires for his car on the previous day and gave one of the officers the address. Detective Childers testified that after responding to the address provided by appellant, no tire store could be found at that location. After checking two nearby tire stores, and over defense counsel's objection, the detective stated that he could not find anyone who sold tires to appellant.
The car was delivered to the Florida Department of Law Enforcement (FDLE), for processing on November 8, 1994, where it was examined by Crime Laboratory Analyst Gary McCullough. An examination of the inside of Norton's car revealed several cleaning products, including: car cleaner, an air freshener, a utility knife, a carpet brush, and a can of carpet stain remover. There were two receipts for these various items dated November 3, 1994: one from Western Auto which was time stamped at 8:56 a.m. and one from Discount Auto Parts stamped at 9:18 a.m. Certain areas of the front passenger seat had been cut and removed and were obviously different than what had originally been in place. The investigation revealed an orange discoloration on the seats of appellant's car, but when tested this did not indicate the presence of blood. The carpet brush and knife, on the other hand, indicated small traces of blood, but the tests could not distinguish among insect, other animal and human blood. Neither Norton's nor the victim's fingerprints were found inside the car.
After hearing all of the evidence, the jury found appellant guilty of first-degree premeditated murder and, by a vote of eight to four, recommended the death penalty. The *91 trial court followed the jury's recommendation, finding one aggravating factor (prior conviction of five violent felonies) and no statutory or nonstatutory mitigating circumstances. The trial court sentenced appellant to death. Appellant raises eight issues on appeal.[5] In reversing appellant's conviction for first-degree murder and sentence, we need address only those issues that pertain to the guilt phase of the trial. Accordingly, claims (6), (7) and (8) are now moot.[6]

PROOF OF UNLAWFUL KILLING
Appellant argues that the circumstantial evidence in this case does not support a finding that he unlawfully killed the victim.[7] We disagree. In order to convict on circumstantial evidence, the State has the burden of presenting evidence that not only is consistent with guilt, but that is inconsistent with any reasonable hypothesis of innocence. Finney v. State, 660 So.2d 674, 679 (Fla.1995); Scott v. State, 581 So.2d 887, 893 (Fla.1991); State v. Law, 559 So.2d 187, 189 (Fla.1989). In this case, however, after viewing the evidence in a light most favorable to the State, see Spinkellink v. State, 313 So.2d 666, 670 (Fla.1975), we find that the State met its burden.
The evidence established that appellant and Thornton had been dating, they were seen together the night Thornton was killed, and Thornton's blood was discovered in appellant's car. A spent shell casing with the same caliber as the ammunition components removed from the victim's skull was found in the back seat of appellant's car. Appellant purchased cleaning supplies the same morning the victim's body was found and had removed the carpeting from the inside of his car. From this evidence, the jury could reasonably have inferred that an unlawful killing occurred and that competent and substantial evidence supported a finding that appellant was the person who caused the death of Lillie Thornton.
Moreover, the State introduced testimony of an eyewitness who saw appellant and Thornton together between 10:30 and 11 p.m. the night she was killed. This evidence directly contradicted appellant's version of events that he was home sleeping. The circumstantial evidence rule does not require a jury to believe the defendant's version of events where the State has produced conflicting testimony. See Finney, 660 So.2d at 680; Spencer v. State, 645 So.2d 377, 381 (Fla. 1994); Holton v. State, 573 So.2d 284, 290 (Fla.1990), cert. denied, 500 U.S. 960, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991). Thus, the jury was free to disregard appellant's alibi evidence.[8]

*92 LACK OF PROOF OF PREMEDITATION
As to appellant's second claim, however, we find there is a complete absence of evidence to support a finding of premeditation. In fact, the total absence of evidence as to the circumstances specifically surrounding the shooting militates against a finding of premeditation. See Terry v. State, 668 So.2d 954, 964 (Fla.1996); Mungin v. State, 689 So.2d 1026, 1029 (Fla.1995). We have set out the facts of this case in great detail, and these facts simply do not support a finding of premeditation.
Premeditation is defined as
more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as the nature of the act to be committed and the probable result of that act.
Coolen v. State, 696 So.2d 738, 741 (Fla.1997) (quoting Wilson v. State, 493 So.2d 1019, 1021 (Fla.1986)). Premeditation may be proven by circumstantial evidence. Holton v. State, 573 So.2d at 289. As this Court stated in Holton:
Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.
Id. at 289 (quoting Larry v. State, 104 So.2d 352, 354 (Fla.1958)). To prove premeditation by circumstantial evidence, "the evidence relied upon by the State must be inconsistent with every other reasonable inference that could be drawn." Id.; accord Long v. State, 689 So.2d 1055, 1057 (Fla.1997). Where the State fails to exclude all reasonable hypotheses that the homicide occurred other than by premeditated design, the defendant's conviction for first-degree murder cannot be sustained. Coolen, 696 So.2d at 741; Hoefert v. State, 617 So.2d 1046, 1048 (Fla.1993); Hall v. State, 403 So.2d 1319, 1321 (Fla.1981).
In Mungin v. State, 689 So.2d 1026 (Fla.), cert. denied, ___ U.S. ___, 118 S.Ct. 102, 139 L.Ed.2d 57 (1997), the defendant shot and killed a convenience store clerk. Although we upheld Mungin's conviction for first-degree felony murder, we found the evidence to be insufficient to establish premeditation:
The State presented evidence that supports premeditation: The victim was shot once in the head at close range; the only injury was the gunshot wound; Mungin procured the murder weapon in advance and had used it before; and the gun required a six-pound pull to fire. But the evidence is also consistent with a killing that occurred on the spur of the moment. There are no statements indicating that Mungin intended to kill the victim, no witnesses to the events preceding the shooting, and no continuing attack that would have suggested premeditation. Although the jury heard evidence of collateral crimes, the jury was instructed that this evidence was admitted for the limited purpose of establishing the shooter's identity.
Id. at 1029. The evidence in the instant case comes no closer to establishing evidence of premeditation than that found to exist in Mungin.
First, no evidence as to a possible motive was shown to exist. During its closing argument, the State told the jury that it is not required to show proof of motive to establish premeditation. While we recognize that motive is not an essential element of homicide, where, as here, the proof of a crime rests on circumstantial evidence, "motive may become ... important." Daniels v. State, 108 So.2d 755, 759 (Fla.1959). The State's concession as to the lack of motive is further proof of the absence of evidence of premeditation in this case. Second, there were no witnesses to the shooting or to the events immediately preceding the shooting. Although McDonald testified that she saw appellant and the victim together on the night of the homicide, this alone does not establish that the shooting was premeditated. Third, there was no evidence of a continuing attack suggesting the possibility of premeditation. Rather, the area where the victim's body was found lacked signs of a struggle. Moreover, the medical examiner testified that, other than the single gunshot wound to *93 the head, there were no other injuries or defense wounds on the victim's body. Fourth, the State elicited no evidence suggesting appellant intended to kill the victim. The record reflects that appellant and the victim had been dating for a month with no signs of difficulties or domestic confrontations. Fifth, there was no evidence that appellant procured a murder weapon in advance of the homicide. Rather, appellant's co-worker testified that appellant offered to sell him a gun. Although one may infer from this testimony that appellant owned a gun, it does not indicate that he intended to use it or that he owned it at the time of the homicide. Finally, the fact that appellant may have taken steps to conceal evidence of a crime does not establish that he committed murder with a preconceived plan or design. See Hoefert, 617 So.2d at 1049 (finding no evidence of premeditation despite pattern of strangulation and efforts by defendant to conceal evidence of crime). Efforts to conceal evidence of premeditated murder are likely to be as consistent with efforts to avoid prosecution for any unlawful killing. Dupree v. State, 615 So.2d 713, 723 (Fla. 1st DCA 1993) (Zehmer, J., dissenting and concurring).
The State argues that the fact the victim suffered a single gunshot wound to the back of her head is evidence of premeditation.[9] While the nature of the crime and the manner of the wound inflicted may constitute circumstantial evidence of how the killing occurred, it is not sufficient to establish premeditation. The gunshot wound inflicted in this case is also consistent with a homicide committed in the spur of the moment. See Kirkland v. State, 684 So.2d 732, 734 (Fla. 1996) (reducing first degree murder to second-degree murder where evidence was consistent with a killing other than by premeditation).
Although the circumstantial evidence in this case may be consistent with an unlawful killing, the evidence is insufficient to prove premeditation. Kirkland; Hoefert. Therefore, based on the lack of evidence as to how the shooting occurred, we find that the State failed to carry its burden in establishing premeditation. In doing so, we hold only that the evidence was insufficient to support premeditation. The evidence does support, however, a finding that appellant committed an unlawful killing commensurate with manslaughter.[10] The absence of evidence in this record as to how the death occurred, other than evidence that it was by gunshot wound and that the appellant was involved, precludes any other holding. Accordingly, we reverse appellant's conviction for first-degree murder and vacate his sentence of death.

OTHER GUILT PHASE ISSUES
We turn now to Norton's remaining guilt phase issues. Appellant argues that the trial court erred in not granting a mistrial where one of the State's witnesses improperly commented on appellant's failure to testify at trial. We disagree. During the State's case in chief, Detective Childers testified that Norton had removed the carpeting from the inside of his car. On cross-examination, defense counsel attempted to ask why:
Q. And at 9:45 his car is in front of his house, and you're saying at that point the carpets were gone?
A. The carpet is gone when I see it, yes, sir.
Q. And there's thirty minutes in between, right?
A. Yes, sir.
Q. Well, twenty-nine and a few seconds, 9:16 to 9:45. Do you agree that that's the time frame that Johnnie Norton is allegedly accused of taking all the carpets out of his car and disposed of them?
A. No, sir.

*94 Q. Took them out before?
A. No, sir.
Q. So why is he buying carpet cleaner?
A. That you'll have to ask him.
Defense counsel did not object at the time the comment was made, but waited until the close of Detective Childers' testimony at which time he moved for a mistrial. Defense counsel argued that Detective Childers' comment, "You'll have to ask him," clearly was a remark on Norton's right not to testify. The trial judge denied Norton's motion for mistrial.
As the State correctly points out, defense counsel's failure to raise a contemporaneous objection to the comment at the time it was made waived his right to argue this issue on appeal. Lowe v. State, 650 So.2d 969, 974 (Fla.1994), cert. denied, 516 U.S. 887, 116 S.Ct. 230, 133 L.Ed.2d 159 (1995); Jackson v. State, 451 So.2d 458, 461 (Fla.1984); Castor v. State, 365 So.2d 701, 703 (Fla.1978). The purpose of the contemporaneous objection rule is to place the trial judge on notice that an error may have occurred and provide him or her with the opportunity to correct the error at an early stage of the proceedings. Castor, 365 So.2d at 703. "[A] timely objection must be made in order to allow curative instructions or admonishment to counsel." Nixon v. State, 572 So.2d 1336, 1341 (Fla. 1990). Thus, despite appellant's motion for mistrial at the close of the witness's testimony, his failure to raise an appropriate objection at the time of the impermissible comment failed to adequately preserve the issue for appellate review.
Furthermore, a party may not invite error during the trial and then attempt to raise that error on appeal. Terry v. State, 668 So.2d 954, 962 (Fla.1996); Czubak v. State, 570 So.2d 925, 928 (Fla.1990); Pope v. State, 441 So.2d 1073, 1076 (Fla.1983). Although an unsolicited comment is not "invited" where it is unresponsive to the question asked, the defense counsel in the instant case, in an unsuccessful attempt to make a point on cross-examination, merely received a direct answer in response to his question. By probing the witness as to why appellant bought carpet cleaners when there were no carpets in his car, a question to which only appellant would know the answer, defense counsel invited the witness' response. Appellant may not now complain on appeal of an error that he himself induced at trial. Terry; Czubak; Castle v. State, 305 So.2d 794, 797 (Fla. 4th DCA 1974), cert. denied, 317 So.2d 766 (Fla.1975).
Next, appellant argues that the State twice attempted to elicit hearsay evidence during its case in chief, thereby undermining his ability to provide a defense. First, appellant claims that the State improvidently asked during its redirect of Detective Childers whether appellant's brother, Trumell Norton, verified his story.[11] Appellant maintains that the State Attorney's question left the impression on the minds of the jury that Trumell did not verify appellant's story. This question came after defense counsel had inquired during cross-examination of Detective Childers as to whether other members of appellant's family verified his story.[12] The court sustained the defense's objection and *95 disallowed any response by the witness as to any statements by Trumell.
The State apparently believed that defense counsel opened the door to this line of questioning during its cross-examination. Thus, the State's subsequent question regarding Trumell was not unreasonable under the circumstances since the defense initiated this line of questioning. Even if error, however, we find it to be harmless. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986). The State's question was an isolated one and the court disallowed the witness's response. Furthermore, the State refrained from commenting further on Trumell's interview with the police or subsequent absence from the trial. Therefore, any error by the State was harmless under the circumstances. DiGuilio.
Second, appellant contends that the State improperly elicited hearsay evidence through Detective Childers' testimony that he could not find anyone who had sold appellant tires. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." § 90.801(1)(c), Fla. Stat. (1993). Although we find no error with the detective testifying that he went to the address given to the police by appellant and that there was no tire store at that location, the trial court erred in allowing the detective to testify that, upon a subsequent search of stores in the vicinity, he could not find anyone who sold tires to defendant. The detective's conclusion is predicated on information he secured from someone else, and, therefore, constitutes hearsay to which no exception was offered. See, e.g., Trotman v. State, 652 So.2d 506, 506 (Fla. 3d DCA 1995) (reversing conviction where police officer offered hearsay testimony as to what non-testifying, unidentified witness had told him about defendant's involvement in crime); Bell v. State, 595 So.2d 232, 234 (Fla. 3d DCA 1992) (finding error where police officer testified regarding statements by non-testifying witness); Burney v. State, 579 So.2d 746 (Fla. 4th DCA 1991) (holding that testimony as to statements by unidentified witnesses implicating defendant was inadmissable hearsay when offered to show the logical sequence of events.) However, in light of all of the evidence against appellant, we find the admission harmless under the circumstances. DiGuilio. The main thrust of the detective's testimony on this point was that there was no tire store at the location asserted by the defendant. That testimony was proper. In addition, tire tracks discovered at the scene and imprinted on the victim's pant leg matched the tread characteristics of the tires on appellant's car; blood found in appellant's car matched that of the victim; and appellant bought cleaning supplies and cleaned the inside of his car the same day the victim's body was discovered. Therefore, in light of this evidence, any error in Detective Childers' testimony was harmless and does not warrant a new trial on that basis.
Finally, appellant claims that the trial court erred in failing to conduct a hearing pursuant to Richardson v. State, 246 So.2d 771 (Fla.1971), when the State attempted to introduce a photograph that appellant claims had not been produced during discovery. We disagree. During the trial, Gary McCullough of FDLE testified that the passenger side window on appellant's car was in the "down" position when it was delivered to FDLE for processing. In an attempt to correct McCullough's testimony, the State introduced a photograph depicting the window in the "up" position.[13] Over defense *96 counsel's objection the trial court admitted the photograph in evidence for the purpose of correcting the witness' mistake.
However, here, even if the trial judge erred in failing to initiate a Richardson hearing, we conclude such error is harmless in light of the facts in this case. See State v. Schopp, 653 So.2d 1016 (Fla.1995) (holding that harmless error analysis applies to inquiries into discovery violations). Because the potential prejudice involved in discovery violations is the risk of surprise on the opposing party and an inability to adequately prepare for trial, rather than the impact on the trier of fact, id. at 1021, the error is harmless since appellant was well aware of the position of the window prior to the State's introduction of the picture into evidence. Pictures were taken of appellant's car at the time it was initially seized by the police. Detective Childers had testified previously that the window was in the up position when he examined appellant's car at the drive-in theater and took pictures of the car which portrayed the blood on the window. Thus, the photograph, which had been only recently developed, merely assisted the State in attempting to correct McCullough's oral testimony that the window was in the down position; it did not depict appellant's automobile in a manner not already known by the defense. In addition, the main purpose of presenting evidence about the window concerned the presence of blood on the window, and not the position of the window at the time the car was seized by the police.

CONCLUSION
In accordance with our determination that the record does not support a conviction for first-degree murder but does support a conviction for manslaughter, we vacate the judgment of conviction for first-degree murder and the sentence imposed therefor, and remand this case to the trial court with instructions to enter judgment against Norton for manslaughter with a firearm and to resentence him accordingly.
It is so ordered.
KOGAN, C.J., OVERTON, SHAW, HARDING, WELLS and ANSTEAD, JJ., and GRIMES, Senior Justice, concur.
NOTES
[1] Appellant called several witnesses on his behalf to testify as to his whereabouts on the day of the murder. However, this alibi evidence was somewhat inconsistent. Appellant told Detective Childers that he called home around 3 or 4 o'clock that afternoon leaving a message with his mother to find Trumell. However, appellant's mother testified that she saw appellant around 4 or 5 p.m. and later saw him leave with Trumell. Appellant's sister, on the other hand, testified that appellant was at her house between 4:30 and 5 p.m. on November 2, 1994. Around 6 p.m., she recalls seeing Trumell at another sister's house but she did not see appellant with him. On the other hand, both appellant's mother and sister testified that they saw appellant return home around 8 p.m. His mother claims he remained there for the rest of the night.
[2] During trial, the defense suggested that the blood on the window possibly was caused by the victim's vaginal discharge as a result of a pelvic inflammatory disease. Dr. J.K. Williams, Thornton's obstetrician and gynecologist, testified that Thornton had been admitted to Tampa General Hospital on October 26, 1994, with pelvic inflammatory disease. When she was discharged the following day, Thornton was suffering from light vaginal bleeding either as a result of the disease or her present form of birth control. However, Dr. Williams had no knowledge of who drove Thornton to and from the hospital.
[3] Appellant, initially, was arrested for robbery because neither a purse nor the check with which Thornton had intended to pay bills was found with the body on November 3. The grand jury indicted appellant only for first-degree murder.
[4] Appellant claimed that he collects shell casings. However, upon a subsequent search of appellant's home, a .22 caliber shell casing was discovered, but no collection.
[5] Appellant's claims are: (1) The trial court erred in failing to grant a motion for acquittal as to evidence that appellant committed the murder; (2) the trial court erred in failing to grant a motion for acquittal as to evidence of premeditation; (3) the trial court erred in failing to grant a mistrial after the State's witness commented on appellant's right not to testify; (4) the State improperly elicited hearsay testimony undermining appellant's defense; (5) the trial court failed to conduct a Richardson hearing; (6) the trial court erred in failing to give appellant's proposed jury instruction on premeditated murder; (7) the trial court erred in admitting evidence of a prior violent felony during the penalty phase of the trial; and (8) the death penalty is disproportionate.
[6] As to claim six, appellant's assertion that the standard instruction given to the jury was deficient in that it failed to address all of the points enunciated in McCutchen v. State, 96 So.2d 152 (Fla.1957), is without merit. A similar challenge was raised and rejected in Spencer v. State, 645 So.2d 377, 382 (Fla.1994), where we stated, "This instruction addresses all of the points discussed in McCutchen, and thus properly instructs the jury about the element of premeditated design."
[7] Appellant cites to Davis v. State, 90 So.2d 629 (Fla.1956) for the proposition that a conviction should be reversed where the circumstantial evidence does not support the verdict and is inconsistent with a reasonable hypothesis of innocence. However, in Davis, there was no evidence placing the defendant at the scene of the crime since the medical examiner placed the time of death at noon and the defendant was with the police from 9 a.m. that morning until 2 p.m. that afternoon. Therefore, Davis is distinguishable from the facts in this case.
[8] As to appellant's claim that the trial court improperly excluded evidence supporting his defense theory that Johnny Seay, Thornton's long-time boyfriend, committed the killing, we find this claim procedurally barred. Appellant failed to proffer the testimony he sought to elicit from Seay regarding prior instances of domestic violence and, therefore, such evidence was not preserved for appellate review. Lucas v. State, 568 So.2d 18, 22 (Fla.1990).
[9] During oral argument, the State relied on the location of the gunshot wound as evidence of premeditation. However, the location of the wound, alone, is not sufficient to establish premeditated murder.
[10] Manslaughter is defined as follows: "The killing of a human being by the act, procurement, or culpable negligence of another, without lawful justification according to the provisions of chapter 776 and in cases in which such killing shall not be excusable homicide or murder, according to the provisions of this chapter, shall be deemed manslaughter...." § 782.07, Fla. Stat. (1993).
[11] During the police investigation, Detective Childers had interviewed Trumell about the events on the day of the murder. However, Trumell, whose whereabouts were unknown at the time of the trial, was not called as a witness by either the State or the defense.
[12] During cross examination, defense counsel asked Detective Childers whether appellant's mother and sister supported appellant's alibi:

Q. Okay. [Appellant] told you he went home and spent the evening with his family, didn't he?
A. Yes, sir.
Q. And did you interview members of his family?
A. Yes, sir.
Q. Did they verify that?
MS. COX: Your honor, I'm going to object. Well never mind.
THE COURT: You may answer.
THE WITNESS: Did I verify what, sir?
Q. That he was home with his mother and two sisters and father?
A. To a time limit.
Q. A time limit on the front end or back end?
A. When you say the back end, I say 10:00 time.
Q. Okay. Hold on. 10:00 is the arrival or leaving time? He arrived at 10:00 or left at 10:00?
A. When last seen by his sister.
[13] The following colloquy occurred:

MR. HENDRIX: The State now has a photograph that's never been provided to the defense. Ms. Cox believes that Mr. McCullough brought the proof sheet, not the photo, to the deposition, that was the deposition Mr. John Skye conducted. I don't believe my office did this deposition. I would have to go back and look prior to our involvement in the case. It's a photograph we haven't seen, and we would certainly like an opportunity to cross-examine the issue, but we would ask for that piece of evidence to be excluded. And we do not believe we were provided it; otherwise we wouldn't have asked the questions we did of him on cross.
THE COURT: Do you want to say anything?
MS. COX: Do I want to say anything?
THE COURT: Uh-huh.
MS. COX: Your Honor, I believe that based on prior discussions with Mr. McCullough, it's his belief that he turned over a copy of the photographs to the defense, although I don't know if that's true or not because I wasn't in this depo, but it only became an issue when he said it in direct.
THE COURT: It appears to correct an error in the witness' testimony. So in the interest of justice I'll let it in.
MR. HENDRIX:
When was that photograph developed?
MS. COX: Yesterday.
THE COURT: Okay. Thank you.