636 So.2d 138 (1994)
STATE of Florida, Appellant,
v.
Charles POWELL, Appellee.
No. 92-2474.
District Court of Appeal of Florida, First District.
April 27, 1994.
*139 Robert A. Butterworth, Atty. Gen., and Wendy S. Morris, Asst. Atty. Gen., Tallahassee, for appellant.
Randall J. Etheridge, Pensacola, for appellee.
LAWRENCE, Judge.
The State of Florida appeals a trial court order granting a motion for judgment of acquittal notwithstanding the jury's verdict finding Charles Powell guilty of premeditated murder. We reverse and remand for reinstatement of the jury verdict.
Powell was charged with the premeditated, first-degree murder of Bernida Faye Montgomery (victim), which occurred on October 27, 1991. Powell is sixty-seven years old, weighs 176 pounds, and has a first-grade education. The victim was twenty-four years old, about 5'11" tall, and weighed approximately 350 pounds. The two had been intimately involved for about sixteen months prior to the shooting. The victim was also dating Leroy Cargill at the same time, and on September 10, 1991, she and Cargill were engaged. Powell was also dating other women, including Mattie Rudolph, while involved with the victim. Powell went to eat dinner at Mattie Rudolph's house on the evening of October 27, 1991, around 6:00 PM and returned home about 7:20 PM. The victim arrived some time after 7:00 PM and was fatally shot about 7:40 or 7:45 PM. Powell did not call the police until about one hour and fifteen minutes after the shooting. When police arrived, he was placed under arrest.
The victim's body was found on the floor of Powell's apartment, in the doorway between his bedroom and an adjoining room, about *140 two feet from the foot of his bed.[1] Powell's gun, a .38 Smith & Wesson revolver which he had owned for fifteen years, was found underneath a pillow at the head of the bed, where he testified that he had always kept it.
The State presented the testimony of Officer Stull during its case-in-chief. Stull related that he arrived at Powell's house at 8:57 PM. Powell told Stull that "he had been arguing with his girlfriend and that a gun went off and she had been shot." Powell told him his girlfriend came to his house about 7:00 PM and was in an argumentative mood over his other girlfriend. The argument became physical and she grabbed Powell's arm, breaking his wristwatch. Powell put his watch on the dresser. He said he began to get angry over the argument, and began to ignore her. He went to use the bathroom. When he came out of the bathroom, he saw her standing by the bed. With her right hand, she pulled out his gun from underneath a pillow on the bed. While she held the gun with both hands, he grabbed her hands with both of his. He pushed her down, she started falling directly back, and the gun went off. He picked up the gun, and placed it back under the pillow. He paced for ten to fifteen minutes and then walked to Mattie Rudolph's house, located a mile away, where he phoned his sister, Ms. Chambers.
Mattie Rudolph testified Powell ate dinner at her house that night and left about 7:20 PM. Powell returned about 8:00 PM, saying: "A lady done got killed at my house, got shot... . She went under the pillow and got my gun and we started tussling over the gun and the gun went off." Mattie told Powell to call his sister, which he did. Powell left, after staying a total of three minutes at Mattie's house. Powell's sister arrived at Mattie's house about thirty minutes later and the two drove to Powell's house.
Ms. Chambers testified Powell phoned her that night and told her the victim had knocked on the door, had entered but had not spoken to him, and had gone to the bed and removed the pistol from under the pillow. Powell had grabbed her, they had wrestled, and the gun fired. Chambers told Powell to call the police. Chambers left her home thirty minutes later, drove to Mattie's house, and then to Powell's house. When they arrived, Powell was sitting on the porch. He had not yet called the police, but proceeded to do so when Chambers told him again.
Clarence West, a crime scene technician, testified he found no fingerprints of any value on the gun. He testified the kitchen ceiling above the counter was marked with lead from the bullet, which came to rest on the kitchen floor. Before conducting an atomic absorption test on the victim's hands to check for gunshot residue, he visually examined them but did not detect any gunpowder. He measured the distance between Mattie Rudolph's house and Powell's house to be one mile (four minutes to drive), and the distance between Ms. Chambers' house and Mattie's house to be 8.7 miles (sixteen minutes to drive). When recalled to the stand, he testified about his efforts to reconstruct the victim's location and position at the time she was shot. Using a styrofoam head and a tripod, he concluded that the only position the victim could have been in when she was shot, given the position of her body and her weight, was standing at or near the doorway, with her head possibly tilted slightly to the right and slightly backwards.
Dr. Gary Cumberland, a pathologist with a specialization in forensic pathology, testified the bullet entered between the victim's left eye and the bridge of her nose. It exited above and behind her right ear. He observed no sign of any "defense wounds," which are wounds or abrasions sustained on other parts of the body when someone tries to deflect an attack.
Greg Scala, a forensic, firearm, and tool mark examiner with the Orlando Crime Lab, also testified for the State. He testified that when a firearm is discharged, the metals barium and antimony are dispersed into the atmosphere and are deposited onto the hands of the person firing the gun or on surfaces *141 near discharge of the firearm. On testing the atomic absorption samples taken from the victim, he found an insufficient amount of barium and antimony on her hands to conclude either way whether she had recently fired or handled a gun. The samples taken from Powell, on the other hand, showed an amount of barium and antimony in Powell's left palm indicative of amounts found on the hands of a person who had handled a discharged firearm or who had his hand in close proximity to a firearm as it discharged.
David Williams, a crime laboratory analyst specializing in firearms identification at the Florida Department of Law Enforcement, concluded the gun's muzzle was probably between fifteen to twenty-one inches from the victim's face when it was fired. He testified he found no lead residues on the front of Powell's shirt, but found some on his left cuff.
Before resting, the State presented the testimony of Carsulania Randall, a close friend of the victim's family; she and the victim called each other "cousins." Randall testified she witnessed a threatening exchange between Powell and the victim about two weeks before the shooting. She and the victim drove to Powell's home on the evening of October 11, 1991. The victim entered the house alone, but after waiting ten minutes in the car, Randall followed. She observed Powell seated on the bed, facing the victim, who was standing. Randall said she heard Powell say to the victim: "Yeah, I seen you coming from out of your nigger's house." Then, to Ms. Randall: "Your cousin thinks she's slick, but she's not slick... . [D]id your cousin tell you that she called me a motherfucker? But I don't take too kindly to nobody calling me a motherfucker." He then reached under a pillow at the end of the bed, patted it and said: "Yeah, Old Betsey will take care of that ... because this right here, it'll handle that, because I don't take too kindly to nobody calling me a motherfucker." He then picked up the gun and waved it around, but did not point it at the victim. The victim then asked Powell whether he would really shoot her, and he stated he would. The victim laughed it off.
At the conclusion of the State's evidence, Powell moved for judgment of acquittal, stating the defense theory was that the shooting was an accident and none of the State's evidence was inconsistent with that of an accident. The trial court did not rule on the motion, but took it under advisement.
Powell then took the witness stand in his defense. He testified he was in bed when the victim knocked on his door. He let her in and he sat down on the side of the bed. From the moment she entered, she was arguing about Mattie Rudolph, saying: "You never wants to go nowhere with me, but if Mattie asks you to go somewhere with her, you go." He told her: "I'm not interested in nothing you have to say." He testified he got up, got his pants off the chair, and went into the bathroom. When he returned, she grabbed his watch, and pulled it off his arm, breaking the band. He picked it off the floor and laid it on the dresser. He then sat down on the dresser. She "stood there about five or ten minutes" talking, and he said nothing. She then "dashed up under [his] pillow and got the gun out." She did not point it at him but was "com[ing] out from under the pillow with the gun." She backed up. He grabbed her hands, drawing them back, and shoved her back.[2] He grabbed with his left hand because his left hand was closer to the gun and pillow from where he was sitting on the dresser. They were "tussling" in the hallway in front of the dresser. The gun went off when he shoved her back. She fell in the door. He paced the floor for a while and then drove to Mattie's house. On returning to his house, he paced between the car and the door for about five minutes.
The defense then played an audiotape of Powell's recorded statement to Officer Jablonski the day after the shooting. Powell told Jablonski the victim knocked on his door and was "raising sand" about Mattie Rudolph. He told her he was not interested in hearing what she had to say and went into the bathroom. When he returned from the *142 bathroom, she was still arguing. The victim told him not to ignore her. He sat on the dresser and she stood by the bed. When she got the gun from under the pillow with her right hand, he grabbed her hand. His hand was over her hand, which was holding the gun. They tussled. When he shoved her back off of him; the gun discharged. He took the gun from her hand, and put it under the pillow.
Both the victim's fiance (Cargill) and Powell agreed the victim was a kind person, did not have a bad temper, was not prone to violence or anger, and was not the type of person who used profanity, such as "motherfucker." Both also agreed she had been acting somewhat differently about two weeks before the shooting; Cargill said she seemed worried about something and Powell said she was "fussing a little."
At the close of all the evidence, Powell renewed his motion for judgment of acquittal, which the trial court continued to take under advisement. The jury was then instructed on first-degree, premeditated murder; second-degree murder; manslaughter; excusable homicide; and justifiable homicide. The jury returned a verdict of guilty as to first-degree, premeditated murder. Powell filed a post-verdict motion for judgment of acquittal, alleging the evidence was all circumstantial and the State had failed to conclusively show Powell's story was inconsistent with his theory of innocence. After a hearing, the trial judge granted Powell's motion, acquitting him of the first-degree murder charge, as well as all lesser-included offenses.
The State contends it presented competent evidence contradicting Powell's theories of innocence, through the testimony of technical and scientific experts regarding the manner in which the homicide was committed, Powell's threat to shoot the victim only two weeks earlier, and the other circumstances of the case. The State further argues that the absence of evidence of a struggle is inconsistent with Powell's theory that a struggle took place wherein the gun discharged accidentally. The State also contends that evidence indicating the muzzle of the gun must have been fifteen to twenty-one inches from the victim's face when fired, along with evidence her hands were not close to a discharging firearm, is inconsistent with Powell's theory that the victim was holding the gun, with her arms outstretched and her wrists bent backwards, when the gun accidentally discharged. We agree with the State that there was sufficient evidence to support the jury verdict in this case.
To overcome a defendant's motion for judgment of acquittal in a case based entirely on circumstantial evidence, the state has the burden of presenting evidence from which the jury can exclude every reasonable hypothesis except that of guilt. Atwater v. State, 626 So.2d 1325, 1328 (Fla. 1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1578, 128 L.Ed.2d 221; State v. Law, 559 So.2d 187, 189 (Fla. 1989). However,
[t]he State is not required to conclusively rebut every possible variation of events which can be inferred from the evidence but only to introduce competent evidence which is inconsistent with the defendant's theory of events. State v. Law, 559 So.2d 187, 189 (Fla. 1989). Once this threshold burden has been met, the question of whether the evidence is sufficient to exclude all reasonable hypotheses of innocence is for the jury to determine.

Atwater, 626 So.2d at 1328 (emphasis added). The test in reviewing the trial court's ruling on the motion, therefore, is not whether, in the opinion of the trial court or appellate court, the evidence fails to exclude every reasonable hypothesis but that of guilt but, rather, whether the jury might reasonably so conclude. Warren v. State, 475 So.2d 1027, 1030 (Fla. 1st DCA 1985). If there is competent evidence from which the jury could reasonably exclude every hypothesis except that of premeditated murder, the verdict will not be reversed. State v. Law, 559 So.2d at 189; Bedford v. State, 589 So.2d 245, 251 (Fla. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1773, 118 L.Ed.2d 432 (1992). That view of the evidence must be taken in the light most favorable to the state. Law, 559 So.2d at 189 (citing Spinkellink v. State, 313 So.2d 666, 670 (Fla. 1975) (in moving for judgment of acquittal, the defendant admits the facts adduced in evidence and every conclusion favorable *143 to the state which is fairly and reasonably inferable therefrom), cert. denied, 428 U.S. 911, 96 S.Ct. 3227, 49 L.Ed.2d 1221 (1976)).
We find that the State in the instant case has met its threshold burden of producing evidence inconsistent with Powell's claim that the shooting was accidental or done in self-defense. First, the State presented evidence showing that only two weeks earlier, Powell had threatened to shoot the victim, and exhibited both jealousy of the victim's "lover," and anger at her calling him a name. Second, Powell testified the gun discharged while they were "tussling" over the gun. Nevertheless, despite the fact the victim was a large woman and the living quarters were rather small, there was no evidence of a struggle. Not even the contents on top of the dresser were disturbed. The State also presented evidence showing the victim had no "defense" wounds on her body. Third, Powell testified the victim pulled his gun on him and the gun fired during the scuffle that ensued when he grabbed the hand with which she held the gun. Nevertheless, if she had been holding the gun and he had been holding his hand over her's, her hand should arguably show similar, if not higher, levels of metals than his. Such was not the case. The atomic absorption tests conducted by Greg Scala showed insufficient levels of barium and antimony on the victim's hands for him to conclude she had been near a discharging firearm, much less holding one in her hand when it discharged. Mr. West's visual inspection of the victim's hands also revealed no visible traces of gunpowder. Powell's left hand, however, had sufficient levels of the metals, indicating he had handled a discharged firearm or had his hand in close proximity to one when it discharged. Lead residues were also found on the left cuff of his shirt. Finally, Powell claims the gun fired while the victim was falling backwards, but the State presented evidence showing the only position the victim could have been in when she was shot was standing.[3]
The State having met its burden, the question becomes whether, on taking the evidence in the light most favorable to the State, there was competent evidence from which the jury could have inferred premeditation to the exclusion of all other possible inferences of innocence, including accident or self-defense. State v. Law. Premeditation is the essential element distinguishing first-degree murder from second-degree murder. Dupree v. State, 615 So.2d 713, 715 (Fla. 1st DCA 1993) (citing Wilson v. State, 493 So.2d 1019, 1021 (Fla. 1986) and Smith v. State, 568 So.2d 965, 967 (Fla. 1st DCA 1990)), review denied, 623 So.2d 495 (Fla. 1993). Premeditation is a fully formed conscious purpose to kill, which may be formed a moment before the act, but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act. Wilson v. State, 493 So.2d at 1021. In proving premeditation with circumstantial evidence, this court has recently stated:
Premeditation, like the other elements of first degree murder, may be established by circumstantial evidence. Evidence from which premeditation may be inferred includes the nature of the weapon used, the presence or absence of adequate provocation, previous problems between the parties, the manner in which the murder was committed, the nature and manner of the wounds inflicted, and the accused's actions before and after the homicide.
Dupree, 615 So.2d at 715 (citations omitted). In Cheshire v. State, 568 So.2d 908, 912 (Fla. 1990), the Florida Supreme Court found competent, substantial evidence to sustain a conviction of premeditated murder where the state presented evidence showing the defendant had threatened to kill his wife six weeks earlier, combined with some physical evidence linking him to the crime (i.e., a shoe print in the victim's driveway that was "probably" *144 the defendant's, and an unidentified blood stain on the defendant's shirt).
We find there is competent evidence in the record to support the jury's verdict of premeditated murder. Randall testified she heard Powell threaten to shoot the victim only two weeks earlier. The jury could reasonably infer from her testimony that Powell was both jealous of the victim's boyfriend and angry because she had called him a "motherfucker." Although Powell claims he was not bothered about the victim's other boyfriend, the victim's recent engagement may have given rise to some jealousy or resentment as it possibly signalled an end to their ongoing sexual relationship. Moreover, from the lack of sufficient metals on the victim's hands to indicate gunshot residue and the undisputedly nonviolent nature of the victim, the jury reasonably could have rejected the defendant's claim that the victim pulled a gun on him and was holding it when it discharged. The evidence indicates the two were arguing that evening, and she broke his watch. The jury could have inferred that Powell formed a fully conscious purpose to kill her at that point, and grabbed his gun with his left hand. The fact Powell later took the gun from the victim's hand and placed it under the pillow, combined with the fact no fingerprints could be identified from the gun, gives rise to the reasonable inference that Powell wiped the prints off the gun before placing it under the pillow, and that he attempted to conceal evidence implicating him in a criminal offense. Finally, Powell's delay of almost one hour and fifteen minutes[4] in calling the police suggests he was using this time to formulate a story to conceal his guilt, and thus is inconsistent with innocence. Under the standard used in Cheshire, the physical evidence, coupled with Powell's recent threat and their argument that night, constitute competent evidence from which the jury could reasonably have found premeditation to the exclusion of all other hypotheses of innocence. Thus, the trial court erred in granting Powell's post-verdict motion and acquitting him of premeditated murder and all lesser-included offenses.
Accordingly, we REVERSE and REMAND with instructions to reinstate the jury verdict, and for proceedings consistent therewith.
BOOTH and MICKLE, JJ., concur.
NOTES
[1] Powell's front door opens up into the bedroom, with the livingroom to the rear of that and the kitchen located at the very rear of the apartment. On entering the apartment, the bed is to the left. A dresser flanks the right wall, across from the bed. The foot of the bed, which was being used as the head of the bed, was the closest to the front door.
[2] On cross-examination, he admitted he did not put his hands over the muzzle and barrel of the gun.
[3] The State also contends it presented evidence indicating the gun was fired 15 to 21 inches from the victim's face, which it contends is inconsistent with the defense's theory that the gun discharged while she was holding it. Nevertheless, the significance of the distance involved is questionable in light of the fact we could find no record evidence indicating the length of the victim's arm.
[4] Taking the evidence in the light most favorable to the State, State v. Law, 559 So.2d 187 (Fla. 1989), almost an hour and fifteen minutes elapsed between the time the victim was shot and the time Powell called the police. Powell testified he paced 10-15 minutes in his apartment before driving to Mattie's (four minutes). He arrived there about 8:00 PM, placing the shooting at about 7:40 PM. His sister testified she left her house half an hour after receiving his phone call. She drove to Mattie's house, which is approximately a 16-minute trip, and then to Powell's house, a four-minute trip. Using this timetable, they arrived around 8:50 PM, after which Powell called police. Officer Stull was dispatched to the scene at 8:57 PM.