722 So.2d 867 (1998)
Leonard Dale LOEHRKE, Appellant/Cross Appellee,
v.
STATE of Florida, Appellee/Cross Appellant.
No. 97-1557.
District Court of Appeal of Florida, Fifth District.
November 20, 1998.
*868 James B. Gibson, Public Defender, and Dee Ball, Assistant Public Defender, Daytona Beach, for appellant/cross appellee.
Robert A. Butterworth, Attorney General, Tallahassee, and Steven J. Guardino, Senior Assistant Attorney General, Daytona Beach, for appellee/cross appellant.
PER CURIAM.
Leonard Loehrke (the defendant) appeals his judgment and sentence which were imposed by the trial court after a jury found him guilty of committing first-degree murder.[1] *869 He argues that the trial court erred in 1) denying his motion to suppress evidence seized pursuant to the execution of a search warrant; 2) denying his motion for mistrial; 3) excluding evidence of the victim's reputation for violence; and 4) denying his motion for a judgment of acquittal. Concluding that none of these claims of error possess merit, we affirm.

Motion to Suppress
On Saturday, March 2, 1996, the Brevard County Sheriff's Department initiated a homicide investigation after the body of Telly Martin was discovered face down in a ditch in Canaveral Groves. The investigation immediately focused on the defendant, who, the day before, had purchased cocaine from Mr. Martin.
Agent Roberts drove to the defendant's residence and saw the defendant exiting his Jeep Cherokee. Agent Roberts called to the defendant, explaining that he was investigating Mr. Martin's murder and asked to speak with the defendant. The defendant agreed. During the conversation, the defendant acknowledged that he knew Mr. Martin and had been with him the previous day. Agent Roberts then requested that the defendant come to the sheriff's office for questioning. The defendant complied with this request and drove his Jeep Cherokee to the sheriff's office.
While at the sheriff's office, the defendant executed a document thereby consenting to the search of his Jeep Cherokee and his other vehicle, a Dodge Colt, which was parked in the driveway of his residence. After the Jeep Cherokee was searched at the sheriff's office, sheriff's agents told the defendant that they intended to return to his house to search the Dodge Colt. At this point, the defendant, who was not in custody, became agitated. He promptly got into his Jeep Cherokee and sped home.
Agent Roberts followed the defendant and they arrived at the defendant's home at about the same time. The defendant parked on his front yard as Agent Roberts pulled his vehicle up in front of the house. The defendant walked very quickly to the Dodge Colt, which was parked in a grassy area on the north side of the driveway, telling Agent Roberts that he had to get his tools out of the car. When the defendant went to the trunk of the car and grabbed a piece of carpet, Agent Roberts told him, "You can't take anything out of your car until it is searched," and instructed him to shut the trunk. The defendant complied and walked into the house, stating he was going to get the keys. When he came back outside, he told Agent Roberts that the Dodge Colt was his wife's car and that she did not want the police to search it. Agent Roberts responded by telling him that in that case he would apply for a warrant to search the vehicle.
Agent Roberts stood outside in the driveway in order to secure the Dodge Colt while a warrant to search the automobile was being requested. The defendant went back inside the house but then came out again, telling Agent Roberts that he could search the car. Agent Roberts testified that by this time he had observed spots on the street and driveway leading all the way up to the garage and toward the front door. After other agents arrived, a preemptive test was conducted. The results indicated that the spots were blood. At that point, Agent Roberts decided to apply for a warrant to search the defendant's house.
Agent Roberts informed the defendant that he was going to request a search warrant for the house. He explained that the defendant could either take his family and leave the residence or he could keep everybody in the living room until the search was completed. The defendant decided to take his family to a friend's house where they stayed overnight. The search warrant was issued and executed during the early morning hours of Sunday, March 3,1996. During the search, police seized physical evidence including blood samples.
Prior to trial, the defendant moved to suppress the evidence seized during the search of his home, arguing that Agent Roberts was not lawfully on the defendant's property when he observed the blood spots on the driveway and therefore his observation *870 of the blood spots should not have been included in the application for a search warrant. The trial court properly rejected this argument. Agent Roberts was lawfully on the defendant's property when he observed the blood spots because the defendant had given the sheriff's department written permission to search his Dodge Colt which he knew was parked in his driveway. See State v. Morsman, 394 So.2d 408 (Fla.), cert. denied, 452 U.S. 930, 101 S.Ct. 3066, 69 L.Ed.2d 431 (1981). The fact that Agent Roberts took the time to seek a warrant authorizing a search of the vehicle as a precautionary measure did not nullify the defendant's earlier consent to the search.
The defendant also argues the trial court should have granted his motion to suppress because the search warrant was improperly executed on a Sunday. In support of this argument, the defendant relies on section 933.101, Florida Statute (1995), which provides:
933.101 Service on Sunday.A search warrant may be executed by being served on Sunday, if expressly authorized in such warrant by the judge or magistrate issuing the same.
He argues that the search of his house was invalid because the warrant did not expressly authorize the police to execute the search on Sunday. This argument was properly rejected by the trial court because, unless prejudice is shown, substantial compliance with the statutory requirements applicable to search warrants is sufficient. See State v. Russo, 389 So.2d 213 (Fla. 4th DCA), appeal dismissed, 392 So.2d 1378 (Fla.1980). The defendant has not argued or established that any prejudice resulted from the execution of the search warrant on a Sunday, and substantial compliance with the statutory warrant requirements has been established. We recognize further that, at the time the warrant was executed, the house was vacant because the defendant had taken his family to stay overnight with friends.

Motion for Mistrial
The defendant next argues that the trial court erred in denying his motion for mistrial. This argument also lacks merit.
During the state's case-in-chief, the prosecutor questioned the defendant's wife concerning inconsistencies between her trial testimony and her previous statements made to the sheriff's agents during the murder investigation. At one point, during direct examination, the prosecutor specifically asked the defendant's wife to review a copy of her written statement in order to refresh her recollection. After reviewing the document, the defendant's wife stated, "I don't know what this is pertaining to here. It's like all broken up." The prosecutor responded by directing her attention to a certain portion of her statement, stating: "Questionwasso the guy laid in your garage half-dead, halfalive." Defense counsel immediately objected and moved for mistrial, arguing that by reading that portion of the document the prosecutor had improperly informed the jury that the police had theorized that the victim had been beaten by the defendant and had remained unconscious in the defendant's garage for a period of time until he was later killed when the defendant inflicted an additional beating. Defense counsel argued that it was improper for the prosecutor to present this question to the jury because the question supported the state's theory of premeditation but the state had failed to elicit any evidence supporting this theory. The trial court denied the motion for mistrial and instead issued the following curative instruction:
Ladies and gentlemen, you are to disregard what the attorney has just started to read to you. This happenedmay have been some questions or interrogation by police officers who have no medical training in this issue.
A mistrial is appropriate only where the error complained of is so prejudicial that it vitiates the entire trial. See Power v. State, 605 So.2d 856 (Fla.1992), cert. denied, 507 U.S. 1037, 113 S.Ct. 1863, 123 L.Ed.2d 483 (1993). Here, the prosecutor's reading of the question from Ms. Loehrke's statement did not vitiate the defendant's right to receive a fair trial because the statement was isolated and it was followed by a proper curative instruction. See § 924.051(7), Fla.Stat. (1997). Furthermore, any error occasioned by the introduction of *871 the statement into evidence was later rendered harmless when defense counsel specifically discussed the statement during his closing argument:
[The prosecutor] guaranteed to you that what you were going to learn was that somehow [the victim] had been stabbed, knocked down, somehow in the garage and that hours later, the thumps of death occurred.... In fact, it's not onlyon that issue, which is really crucial because that's where the state, I guess, got the premeditation. So it's not onlyit's not a fact it is that the actual facts presented by the state make that scenario absolutely impossible.

Reputation Testimony
During trial, the first defense witness called to testify was Gloria Mathis. Ms. Mathis testified that on the day of the killing she saw the defendant and the victim at Elton Hagans' house arguing over money, and that the victim told the defendant that "if he didn't pay him his money, he was going to f__ him up." When defense counsel sought to question Ms. Mathis about the victim's reputation, the trial court sustained the state's objection, ruling that the victim's reputation would have to have been known to the defendant in order for such testimony to be admissible. On appeal, the defendant challenges this ruling. We affirm the trial court because no reversible error has been demonstrated.
A conviction cannot be reversed absent an express finding that prejudicial error occurred in the trial court. See § 924.051(7), Fla.Stat. (1997). Prejudicial error means an error that harmfully affected the judgment. See § 924.051(1)(a), Fla.Stat. (1997). No prejudicial error resulting from the court's limitation of Ms. Mathis' testimony has been established.
In that regard, proper appellate review of this claim of error is not available because the defendant failed to proffer the content of Ms. Mathis' purported testimony to the trial court. This court cannot conclude that the trial court erred in excluding Ms. Mathis' testimony because we do not know what her testimony would have been. See Powers v. State, 224 So.2d 411, 412 (Fla. 3d DCA), cert. denied, 232 So.2d 180 (Fla.1969).
Furthermore, even if the trial court did err in limiting the scope of Ms. Mathis' testimony, such error was harmless because her testimony regarding the victim's reputation would have been merely cumulative since evidence concerning the victim's reputation for violence was introduced during the state's case-in-chief. See Billeaud v. State, 578 So.2d 343, 344 (Fla. 1st DCA), rev. denied, 583 So.2d 1034 (Fla.1991). On crossexamination, the state's witness, Elton Hagans, testified that he knew the victim's reputation for violence. Specifically, when asked why he had warned the defendant not to ask the victim for any drugs that he couldn't pay for, Mr. Hagans responded that he had been told that the victim "can go off." Upon further questioning, Mr. Hagans testified that he had described the victim to the police as a jitterbug, explaining that to him a jitterbug is someone under age and that "a lot of jitterbugs nowadays, they do have a tendency to have a short temper." When asked if he heard whether the victim could go off in a second, Hagans responded, "Right." Defense counsel then referred to Mr Hagans' statement to the police in which he said, "I tried to stay away from around him. He's the type that the least little thing you do to him, offend him, he's liable to hurt you." Mr. Hagans testified that he heard the victim would fight and he had to have it his own way. Thereafter, on recross, Mr. Hagans testified that his girlfriend had told him "how violent [the victim] was."

Motion for Judgment of Acquittal
Finally, we address the defendant's claim that the trial court erred in denying his motion for judgment of acquittal because the state failed to submit sufficient evidence of premeditation. We again find no error.
In order to survive a motion for judgment of acquittal the state has the burden of presenting evidence from which the jury can exclude every reasonable hypothesis except that of guilt. See State v. Powell, 636 So.2d 138, 142 (Fla. 1st DCA), rev. dismissed, 645 So.2d 454 (Fla.1994). In order to sustain this burden, the state must introduce *872 competent evidence which is inconsistent with the defendant's theory of events. Id.
In a first-degree premeditated murder case, the state is required to present competent evidence that the murder was committed with a premeditated design to the exclusion of all the reasonable conclusions. See id.
Premeditation, as an element of first-degree murder, is a fully-formed conscious purpose to kill, which exists in the mind of the perpetrator for a sufficient length of time to permit reflection, and in pursuance of which an act of killing ensues. Premeditation does not have to be contemplated for any particular period of time before the act, and may occur in moments before the act, and may occur a moment before the act.... It must exist for such time before the homicide as to enable the accused to be conscious of the nature of the deed he is about to commit and the probable result to flow from it insofar as the life of the victim is concerned.
Jackson v. State, 575 So.2d 181, 185 (Fla. 1991) (citations omitted). Premeditation may be established by inferences arising from circumstantial evidence including the nature of the weapon used, the presence or absence of adequate provocation, previous difficulty between the parties, the manner in which the homicide was committed, the nature and manner of the wounds inflicted, and the accused's actions before and after the homicide. See Powell, 636 So.2d at 143 (citing Dupree v. State, 615 So.2d 713 (Fla. 1st DCA), rev. denied, 623 So.2d 495 (Fla.1993)). In Kramer v. State, 619 So.2d 274, 276 (Fla.1993), our supreme court held that blood spatter and victim injury evidence can provide a sufficient basis for the conclusion that premeditation existed.
Here, the state presented expert medical evidence establishing that the victim was beaten to death by the defendant, and that the beating involved repeated strikes to the victim's back and head, two stab wounds around his neck, and wounds on his hand. The medical expert testified that the victim's hand wounds were consistent with the victim defending himself from blows inflicted by another person. Additional testimony was submitted which indicated that the defendant did not have any injuries on his body when the police questioned him the day after the murder. This evidence was inconsistent with the defendant's claims that (1) the victim had initiated the incident by attacking him with a knife, (2) the victim must have stabbed himself in the neck because the defendant never had the knife in his hand, and (3) he had hit the victim in the back with a baseball bat only once.
The medical expert described the stab wounds located in the front and back of the victim's neck and on the upper part of the victim's back and shoulder blades. He also identified a bruise on the back of the victim's left hand. Referring to the injuries on the victim's hands, the medical expert testified, "Whenever you see these types of injuries, usually would be presenting a defense-type posture in order for the person to ward off blows inflicted by another person."
Furthermore, the medical expert testified that the victim had four wounds on his head which had been inflicted by some form of blunt trauma. There were skull fractures under the wounds on the left side of the head which had caused hemorrhaging. It was the expert's opinion that this hemorrhaging caused the victim's death and that any of the wounds to the victim's head independently could have caused death. He also opined that the bruises on the victim's back were a result of multiple strikings with the broad side of a baseball bat.
It appeared to the medical expert that the wounds were all inflicted within a short period of time. He testified that the victim was still alive when all of the wounds were inflicted and that the two stab wounds caused great pain to the victim. The defendant also testified on cross-examination that blood spewed all over the walls of his garage every time he hit the victim's head with the baseball bat.
The medical testimony regarding the victim's injuries, in conjunction with the trial evidence concerning the defendant's lack of injuries, his efforts to cover up the murder by cleaning blood from his garage, dumping *873 the victim's body on the side of the road, and later lying to several people including the police as to his involvement with the victim on the day of the murder, and the fact he testified that he never possessed the knife which inflicted the stab wounds on victim's neck constituted sufficient evidence of premeditation to overcome the defendant's motion for judgment of acquittal. See Heiney v. State, 447 So.2d 210 (Fla.) cert. denied, 469 U.S. 920, 105 S.Ct. 303, 83 L.Ed.2d 237 (1984).

Conclusion
The defendant's judgment and sentence are affirmed because no reversible error has been established.
AFFIRMED.
COBB, THOMPSON and ANTOON, JJ., concur.
NOTES
[1] § 782.04, Fla.Stat. (1995).