779 So.2d 574 (2001)
Jimmy BEDOYA, Appellant,
v.
STATE of Florida, Appellee.
No. 5D00-302.
District Court of Appeal of Florida, Fifth District.
February 9, 2001.
Rehearing Denied March 12, 2001.
*576 Ryan Thomas Truskoski of Ryan Thomas Truskoski, P.A., Orlando, and F. Wesley Blankner, Jr. of Jaeger & Blankner, P.A., Orlando, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Angela D. McCravy, Assistant Attorney General, Daytona Beach, for Appellee.
SAWAYA, J.
Seventeen-year-old Shauna Card was brutally murdered in her home. The Appellant, Jimmy Bedoya, appeals his conviction and sentence for the first degree murder of this young woman. We affirm.
Bedoya raises two issues that warrant discussion: 1) whether the State proved that the murder was premeditated; and 2) whether the trial court erred in denying his motion to suppress his recorded statement based on violation of his Miranda rights. We will first discuss the factual background of the instant case followed by our discussion of each of these issues.

Factual Background
Shauna, a high school student, lived with her mother, Pauline Card, in an apartment. Bedoya lived in the same apartment complex. On January 31, 1995, Shauna returned home from school and phoned her mother twice at her place of employment. Pauline had no further contact with her daughter until she arrived home from work that evening. She entered what she thought was an unusually quiet apartment to find the mutilated, blood-covered body of her daughter in the guest bathroom. The evidence indicates that a violent struggle took place in the apartment between Shauna and her murderer.
There were a total of seventy-four wounds on Shauna's body which included stabs, cuts, abrasions and contusions. A blood-covered butter knife bearing the right thumb print of Bedoya was found on top of Shauna's body. In addition, another butter knife, a black-handled steak knife, and a pair of scissors were discovered on the floor of the bathroom. In Pauline's bedroom, a white, recently-washed sweat shirt was found spotted with blood. A kitchen dish towel found just outside the bathroom door also contained blood spots. DNA testing later revealed that the blood on both the sweat shirt and dish towel came from Shauna and Bedoya.[1]
*577 A trail of blood was discovered on the kitchen floor that lead to a utensil drawer. Bedoya's left thumb print was discovered on the exterior of the drawer and blood, hair, and fiber evidence was discovered inside the drawer. Another butter knife and a steak knife were discovered underneath the kitchen sink. One of the knives was bent to almost a forty-five degree angle. A blood-laden blade from a potato peeler was also found under a bag of potatoes in the kitchen.
As the investigation continued, law enforcement obtained DNA samples from various individuals to attempt to match the blood found in various parts of the apartment with the donor. When Bedoya's sample provided a positive match, Bedoya was contacted by an investigator with the sheriff's department. The investigator told Bedoya that he wanted to discuss the case with him and show him some pictures. Bedoya agreed to go to the sheriff's department, but needed a ride. When the two detectives arrived at Bedoya's home, they offered to let Bedoya's brother, who was home at the time, transport Bedoya to the station. However, Bedoya chose instead to ride with the detectives. Once at the station, Bedoya was questioned and presented with the DNA and fingerprint evidence. The questioning was tape recorded and videotaped. Based upon the interview, Bedoya was arrested and taken into custody.

Premeditation
Bedoya claims that the State failed to prove that the murder was premeditated. Section 782.04(1)(a), Florida Statutes (1995) provides that premeditated first-degree murder is the unlawful killing of a human being "[w]hen perpetrated from a premeditated design to effect the death of the person killed or any human being." Premeditation is defined as
[M]ore than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.
Woods v. State, 733 So.2d 980, 985 (Fla. 1999) (quoting Wilson v. State, 493 So.2d 1019, 1021 (Fla.1986)).
Much of the evidence in this case linking Bedoya to the murder is fingerprint and DNA evidence which is generally considered a species of circumstantial evidence. See Thorp v. State, 777 So.2d 385 (Fla.2000); Washington v. State, 653 So.2d 362 (Fla.1994); Mutcherson v. State, 696 So.2d 420, 422 (Fla. 2d DCA 1997) ("Fingerprint evidence is merely a variety of circumstantial evidence."). Premeditation may be established by circumstantial evidence. *578 Woods; Norton v. State, 709 So.2d 87 (Fla.1997); Holton v. State, 573 So.2d 284 (Fla.1990); Loehrke v. State, 722 So.2d 867 (Fla. 5th DCA 1998). To prove premeditation by circumstantial evidence, the state must exclude all reasonable hypotheses that the homicide occurred other than by premeditated design. Norton. Whether the state meets this burden of proof is usually a question of fact for the jury. See Dupree v. State, 615 So.2d 713 (Fla. 1st DCA 1993).
Evidence from which the element of premeditation may be inferred includes "the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted." Woods, 733 So.2d at 985 (quoting Spencer v. State, 645 So.2d 377, 381 (Fla.1994)); see also Loehrke. We find that the record in the instant case discloses sufficient evidence from which the jury could exclude all reasonable hypotheses that the murder occurred other than by premeditated design on the part of Bedoya.
The evidence reveals that several different weapons were used to inflict the wounds on Shauna ranging from knives to a potato peeler. In fact, Bedoya's fingerprint was found on the knife located on the top of Shauna's body. The manner in which the murder was committed and the nature of the wounds reveal that the murderer expended much effort and energy engaging in a violent and continuing attack against Shauna. See Norton, 709 So.2d at 92 (finding that the evidence in that particular case was insufficient to establish premeditation because "there was no evidence of a continuing attack suggesting the possibility of premeditation."). There were seventy-four wounds on Shauna's body. The State points out that forty-five of these were stab wounds which required separate thrusts to Shauna's body and that approximately thirty-five of those wounds were of significant depth. Moreover, blood from Shauna and Bedoya was found in three separate rooms, indicating that the struggle continued for some time throughout various rooms in the apartment. See Kramer v. State, 619 So.2d 274, 276 (Fla.1993) ("The blood spatter and victim injury, however, provide a substantial basis for the conclusion that premeditation existed."); see also Loehrke. We agree with the State's argument that "chasing the victim from one room to another, running back and forth to the kitchen to get weapons, and switching willy-nilly between seven different weapons, shows Bedoya spent quite a bit of time perpetrating this crime."
Significantly, we also find no evidence in the record that Shauna provoked the attack against her by Bedoya. The record reveals that Shauna and Bedoya did not know each other very well and did not socialize together. Although they lived in the same apartment complex and rode the same school bus to and from school, there is no evidence that they had any disagreements between them which would indicate that the attack was provoked. Although the State presented no motive for the murder, which may be probative of premeditation in a circumstantial case, motive is not an essential element of the crime of first degree murder and a person may be convicted of this crime even if no motive is established. See Norton (citing Daniels v. State, 108 So.2d 755 (Fla.1959)).

The Miranda Issue
When Bedoya was taken to the sheriffs department for questioning, he gave a statement that he had never been in Shauna's apartment. He was not given his Miranda[2] warning prior to making this statement and he claims that his statement was recorded and videotaped without his knowledge or consent. He contends, therefore, that the trial court erred when it denied his motion to suppress and subsequently *579 allowed his statement into evidence.
Miranda warnings are only required when a defendant is in custody and subjected to interrogation. See Davis v. State, 698 So.2d 1182 (Fla.1997), cert. denied, 522 U.S. 1127, 118 S.Ct. 1076, 140 L.Ed.2d 134 (1998). If either custody or interrogation is absent, Miranda warnings are not required. Id. The State contends that although Bedoya was interrogated, he was not in custody and, therefore, Miranda warnings were not required.
In order to determine whether a defendant is in custody for purposes of the Miranda warning, the primary inquiry is whether a reasonable person in the same position as the defendant would believe that his or her freedom was curtailed to a degree associated with actual arrest. Mansfield v. State, 758 So.2d 636 (Fla. 2000) (quoting Ramirez v. State, 739 So.2d 568, 574 (Fla.1999), cert. denied, 528 U.S. 1131, 120 S.Ct. 970, 145 L.Ed.2d 841 (2000)). There are four factors that guide this determination: 1) the manner in which the police summon the suspect for questioning; 2) the purpose, place, and manner of the interrogation; 3) the extent to which the suspect is confronted with evidence of his guilt; and 4) whether the suspect is informed that he or she is free to leave. Id. at 644.
Applying the above-referenced criteria to the facts of the instant case, we conclude that Bedoya's Miranda rights were not violated. First, after law enforcement contacted Bedoya, he voluntarily presented himself for questioning. In fact, when presented with the opportunity to go to the sheriffs department with his brother, Bedoya chose to ride with the detectives. Additionally, although the lead investigator had evidence against Bedoya and was likely to arrest him, Bedoya was free to leave, as he was told in the initial interrogation. At the sheriffs department, the investigator specifically stated, "You need to go to the rest room, you need ... want water or anything like that, just give us a holler here. We'll stop.... You know that you're not under arrest and that at anytime you want to just walk out of here, you can walk out of here." Moreover, the unarticulated plan of law enforcement to arrest an individual is not relevant to how a reasonable person would perceive the situation. See Davis, 698 So.2d at 1188 ("[T]he sole fact that police had a warrant for Davis's arrest at the time he went to the station does not conclusively establish that he was in custody."). Thus, for purposes of Mansfield, Bedoya was under interrogation, but he was not in custody.
In regard to Bedoya's second argument, the fact that the interview was audiotaped and videotaped without his consent or knowledge does not constitute a violation of his due process rights. In order for the Fourth Amendment right to privacy to exist, the person must have a subjective expectation of privacy, and that expectation must be one that society recognizes as reasonable. State v. Smith, 641 So.2d 849, 851 (Fla.1994); Boyer v. State, 736 So.2d 64 (Fla. 4th DCA 1999). Although the investigators did not tell Bedoya at the outset that he was the main suspect or that he would be arrested at the conclusion of the interview, they did not attempt to foster any particular sense of privacy in the conversation. Moreover, a defendant does not have a reasonable expectation of privacy in a police interview room. See State v. Calhoun, 479 So.2d 241 (Fla. 4th DCA 1985); see also Boyer; Johnson v. State, 730 So.2d 368 (Fla. 5th DCA 1999).
Bedoya argues that Robinson v. State, 535 So.2d 610 (Fla. 5th DCA 1988), supports his contention that the motion to suppress should have been granted. However, Robinson is distinguishable from the instant case. In Robinson, the defendant had agreed to speak with officers as long as her attorney was present. The officers began the interview without the attorney when he was late and thereafter denied him admission into the interview room *580 when he did arrive. Here, Bedoya made no such request. Accordingly, the trial court's denial of Bedoya's motion to suppress was not error.

Conclusion
We conclude that the State presented sufficient evidence to prove premeditation. We also conclude that Bedoya was not in custody at the time his recorded statement was given and that his Miranda rights were not violated. We affirm Bedoya's conviction and sentence.
AFFIRMED.
SHARP, W., and GRIFFIN, JJ., concur.
NOTES
[1] In July of 1995, Polymerase Chain Reaction DNA tests, conducted by the Florida Department of Law Enforcement's Crime Lab in Orlando, revealed that there were several samples of blood taken from the apartment that did not match that of Shauna or Pauline. Those samples were sent to Labcorp Laboratory, Inc. in North Carolina, for additional testing. At Labcorp, the samples were subjected to Short Tandem Repeat and Amelogin DNA testing. DNA profiles were developed of all the samples which indicated that the blood belonged to a male individual. However, at that time there were no suspects to compare the DNA profiles with.

In February and April 1996, additional DNA samples from various individuals were submitted for comparison with the profiles. All of those samples were eliminated as donors. In July 1996, six more DNA samples were entered for comparison with the unknown blood from the crime scene. At that time, Shauna's father, Kent Card, and another individual, Jason Wise, could not be excluded as donors of the unknown blood. The investigation continued and in October 1997, Bedoya voluntarily provided a DNA sample, which was taken through a mouth swab. On March 9, 1998, approximately three years after the murder was committed, law enforcement obtained what they thought to be a positive match between the unknown blood sample and Bedoya's swab sample.
In April 1998, a blood sample was taken from Bedoya. Upon analysis, neither his blood, nor the blood of three other individuals could be excluded as donors of the unknown samples found at the crime scene. Based upon further testing, all those individuals' samples were excluded as possible donors, except for Bedoya's. Sometime later, all of the blood samples that had been matched to Bedoya were resubmitted to Labcorp, along with a sample of Bedoya's blood, for comparison with the DNA profiles Labcorp had prepared in 1995. The second tests, like those conducted in Orlando, revealed that the blood on the dish towel, sweat shirt and carpet matched Bedoya's.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).