987 So.2d 111 (2008)
Robert Earl FOWLER, Appellant,
v.
STATE of Florida, Appellee.
No. 1D06-6543.
District Court of Appeal of Florida, First District.
June 30, 2008.
Rehearing Denied August 6, 2008.
*112 Nancy A. Daniels, Public Defender, and Jamie Spivey, Assistant Public Defender, Tallahassee, for Appellant.
Bill McCollum, Attorney General, and Philip W. Edwards, Assistant Attorney General, Tallahassee, for Appellee.
WOLF, J.
Appellant challenges his conviction for sexual battery on a child under 12 years of age. He raises one issue on appeal, whether the trial court properly denied appellant's motion for judgment of acquittal where the victim could not point appellant out in court. We find that the circumstantial evidence concerning the identity of the perpetrator was sufficient to support the conviction and affirm.
Appellant, Robert Earl Fowler, was charged by information on November 29, 2006, for one count of sexual battery on a child under 12, per section 794.011(2)(a), Florida Statutes (2004), and one count of lewd and lascivious molestation on a child under 12, per section 800.04(5)(b), Florida Statutes (2004). The alleged conduct giving rise to both charges occurred sometime between August 29, 2004, and December 29, 2005.
At appellant's trial, G.J., who was 6 years old, testified she was watching television in her mother's bedroom when a man named "Earl" entered the room and locked the door. She testified that he then "put his private part in my mouth." Earl referred to his private part as a "doughnut." G.J. did not tell her mother about the incident immediately because she was scared. The record demonstrates G.J. was about 4 years old at the time of the alleged crime.
G.J.'s mother, Janifer Barnes, lived with appellant, who goes by "Earl," from 2003 to 2004. Barnes, testifying for the State, pointed to appellant when asked to identify Robert Earl Fowler. Barnes said that she had observed appellant discipline G.J. and felt that his methods were inappropriate, but she had not suspected sexual abuse. Barnes had also noticed that G.J. often flinched when appellant entered the room. After noticing black and blue marks on G.J.'s bottom, Barnes took G.J., moved out, and subsequently married Mr. Frederick "Freddy" Barnes, whom G.J. calls *113 "Daddy." The two were still married at the time of trial.
Both Barnes and her husband testified that G.J. entered the Barnes' bedroom one morning and, upon seeing the married couple in bed and under the covers (though not engaged in sexual activity), said, "I know what y'all are doing." When they asked her what she thought they were doing, G.J. responded, "I think you're sucking his doughnut." Neither Barnes nor her husband had referred to genitalia as a "doughnut." G.J. told her mother she called it a doughnut because "that's what Earl called it." At an interview with the Child Protection Team, the video of which was presented as evidence to the jury, G.J. again identified "Earl" as the man who entered her room. G.J. continued to identify Earl as the perpetrator at trial, stating that Earl "was mean" and "put his private part in my mouth."
Although appellant goes by his middle name, Earl, G.J. was unable to point him out in court. Counsel for the State asked the girl to "[s]tand up and look around and tell me if you see Earl." After looking around, G.J. answered, "No." The court later observed that G.J.'s view of appellant "was not impeded and she looked in [appellant's] direction."
G.J. had behavioral problems which, in Barnes' opinion, worsened during the time she and G.J. lived with appellant. Barnes testified that no men besides appellant had access to G.J. when she was not around. On rebuttal for the State, Ms. Turman, Barnes' cousin, also testified that prior to living with appellant, G.J. was a happy child who, by the end of her mother's relationship, flinched or cried when appellant came near her. Turman further testified that G.J. would put her hands up to protect her head when appellant was close to her.
Appellant argues on appeal that G.J. could not identify appellant as "Earl" and that, if G.J. implicated anyone, it was Frederick Barnes. In support, appellant points to evidence presented by the State, the videotaped interview between G.J. and a member of the Child Protection Team, which was played for the jury. The transcript reads:
PROTECTION TEAM: About Earl. Tell me about Earl. Who is Earl?
[G.J.]: My momma's husband.
PROTECTION TEAM: ... Your momma's husband now or your momma's husband before?
[G.J.]: (inaudible).
. . . .
PROTECTION TEAM: When did you tell [your mother]?
[G.J.]: In the morning. In the morning when we woke up, and I saw Earl in bed....
Elsewhere on the videotape, however, G.J. clearly distinguished "Earl" from Frederick Barnes by stating, when asked if Earl still lived with her, that her mother did not like him anymore. Also, at trial, G.J. could not remember whether she had ever lived in the same house with Earl, yet she stated she was currently living with Frederick Barnes. Upon examination at trial, the prosecutor asked G.J., "Did Freddy Barnes ever do anything bad to you like Earl did?" and "Did anyone else ever do anything bad to you like Earl did?" G.J. replied, "No, sir," to both questions.
The jury returned a guilty verdict on both counts, and appellant was sentenced to life imprisonment with no eligibility for parole.
The trial court's denial of a motion for judgment of acquittal is reviewed de novo. Baugh v. State, 961 So.2d 198, 204 (Fla.2007); Jones v. State, 790 So.2d 1194, 1196 (Fla. 1st DCA 2001). The test upon *114 review is not whether the evidence proves guilt beyond a reasonable doubt; instead, the appellate court considers only whether the jury could reasonably determine guilt given the evidence presented. State v. Powell, 636 So.2d 138, 142 (Fla. 1st DCA 1994), review dismissed, 645 So.2d 454 (Fla.1994).
As to the evidence presented, this court has explained that:
When a defendant moves for a judgment of acquittal, he "admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence."
Criner v. State, 943 So.2d 224, 225 (Fla. 1st DCA 2006) (quoting Lynch v. State, 293 So.2d 44, 45 (Fla.1974)). Thus, a "judgment of acquittal should only be granted when the jury cannot reasonably view the evidence in any manner favorable to the opposing party." Id.
Appellant was adjudicated guilty of violating sections 794.011(2)(a) and 800.04(5)(b), Florida Statutes. To prove a violation of either law, the State must show that the proscribed conduct occurred and that the appellant was the perpetrator. §§ 794.011(2)(a), 800.04(5)(b), Fla. Stat.
Appellant's motion for judgment of acquittal was based on the belief that the State failed to satisfy the second requirement, identification of the defendant. Appellant draws attention to the fact that G.J. was given the opportunity at court to identify the perpetrator, but could not point him out.
There is no binding authority addressing a situation in which a primary child witness is willing and able to testify against the defendant, all-the-while referring to him by name, yet is still unable to point him out in court when asked. Cases invariably involve the admissibility of out-of-court identifications in several contexts. See, e.g., Dep't of Health & Rehabilitative Servs. v. M.B., 701 So.2d 1155, 1156 (Fla. 1997) (involving an in-court recantation of allegations); State v. Freber, 366 So.2d 426, 428 (Fla.1978) (addressing an inability to recognize an unfamiliar defendant); State v. Contreras, 979 So.2d 896 (Fla. 2008) (discussing an inability to testify altogether).
However, case law does establish that a witness's ability to point the defendant out in court is not a necessary component of the case. See, e.g., Freber, 366 So.2d at 428; C.C., Jr. v. State, 943 So.2d 905, 905 (Fla. 5th DCA 2006). The identity of the perpetrator can therefore be inferred from circumstantial evidence, and the lack of direct, in-court identification, goes to the strength of the case. See C.C., 943 So.2d at 905-06 ("[T]he trier of fact chose to believe the victim [despite the lack of in-court identification] ... and we cannot substitute our judgment for the fact-finder's on issues of witness credibility.").
The supreme court in Freber noted that requiring witnesses to physically point the defendant out in court would "encourage defendants to change their appearance before trial to avoid being identified in court.[*] Without this proof that the person previously identified by the witness was the defendant, conviction would in some instances be impossible." 366 So.2d at 428. Moreover, in the context of child molestation cases, the court has noted the problem of the "child sexual abuse accommodation *115 syndrome," under which the child recants his or her allegations in an attempt to restore peace in the family. See M.B., 701 So.2d at 1156.
Other jurisdictions have similarly recognized that the identity of a defendant can be established by inference and circumstantial evidence. The Eleventh Circuit, for instance, affirmed the conviction of two defendants who had the same names and fingerprints of the suspected criminals, but who were apparently not pointed out at trial. United States v. Chambliss, 267 Fed.Appx. 870 (11th Cir.2008). There, the court found that "the jury could reasonably infer that the suspect `Michael Chambliss' was the same Chambliss who was in court," based on the circumstantial evidence presented at trial. Id. at 872.
The Fifth Circuit, while stating that "a witness need not physically point out a defendant so long as the evidence is sufficient to permit the inference that the person on trial was the person who committed the crime," reversed such a conviction where an unseen perpetrator used the defendant's name in letters and over the phone to commit fraud. United States v. Darrell, 629 F.2d 1089, 1091 (5th Cir.1980). In Darrell, there was no corroborating evidence to connect the defendant to the individual using the defendant's name nothing aside from the use of the name. Id. Thus, the court found the inference of defendant's guilt to be impermissible. Id. The court has also noted, however, that where there is at least some circumstantial evidence, the conviction should be upheld. See United States v. Ferguson, 211 F.3d 878, 884 (5th Cir.2000) (finding that uncertain in-court identification combined with out-of-court identification and possession of same type of firearm was enough to permit the inference of guilt).
Finally, a Texas intermediate court recently elaborated on the relative importance of an in-court identification:
When a defendant contests the identity element of the offense, we are mindful that identity may be proven by direct evidence, circumstantial evidence, or even inferences. Although a direct in-court identification is the preferred procedure, where the circumstances do not indicate the likelihood of confusion, that type of identification is not required. If there is no in-court identification of the perpetrator's identity elicited from trial witnesses, no formalized procedure is required for the State to prove the identity of the accused ... [T]he absence of an in-court identification is merely a factor for the jury to consider in assessing the weight and credibility of the witnesses' testimony.
Wiggins v. State, 255 S.W.3d 766, ____ (Tex.Crim.App. 2008) (citations omitted).
Viewing the evidence in the light most favorable to the State, there was enough evidence for the jury to find that appellant was the "Earl" who committed sexual battery and lewd and lascivious molestation on G.J.
Although G.J. was unable to point to appellant in court, G.J. continually, both in court and out of court, referred to the man who put his "doughnut" in her mouth as "Earl," the name by which appellant is known. Her mother and stepfather testified that they never referred to genitalia as a "doughnut," and Earl was the source of the term. G.J.'s interview with the CPT contained the same allegations against Earl. G.J. also described the encounter with "Earl" at trial. Appellant, named Earl, was living with G.J. and had sole access to her for a period of time, according to G.J.'s mother. No other "Earl" would have had this access. Accepting this evidence as required for purposes of *116 review, it is certainly reasonable to determine that appellant, whose middle name is Earl and who routinely went by the name "Earl," was the man described by G.J. as engaging in the proscribed conduct.
For the foregoing reasons, we AFFIRM.
ALLEN and POLSTON, JJ., concur.
NOTES
[*] There is no evidence in the record establishing to what extent the defendant's appearance had changed prior to trial.